[No. 42775.    En Banc.    March 14, 1974.]

Morrison P. Helling et al., Petitioners, v. Thomas F. Carey et al., Respondents.

*Olwell, Boyle & Hattrup* and *Lee Olwell,* for petitioners.

*Williams, Lanza, Kastner & Gibbs* and *Henry E. Kastner,* for respondents.

HUNTER, J.—This case arises from a malpractice action instituted by the plaintiff (petitioner), Barbara Helling.

The plaintiff suffers from primary open angle glaucoma. Primary open angle glaucoma is essentially a condition of the eye in which there is an interference in the ease with which the nourishing fluids can flow out of the eye. Such a condition results in pressure gradually rising above the normal level to such an extent that damage is produced to the optic nerve and its fibers with resultant loss in vision. The first loss usually occurs in the periphery of the field of vision. The disease usually has few symptoms and, in the absence of a pressure test, is often undetected until the damage has become extensive and irreversible.

The defendants (respondents), Dr. Thomas F. Carey and Dr. Robert C. Laughlin, are partners who practice the medical specialty of ophthalmology. Ophthalmology involves the diagnosis and treatment of defects and diseases of the eye.

The plaintiff first consulted the defendants for myopia, nearsightedness, in 1959. At that time she was fitted with contact lenses. She next consulted the defendants in Sep-

tember 1963, concerning irritation caused by the contact lenses. Additional consultations occurred in October 1963; February 1967; September 1967; October 1967; May 1968; July 1968; August 1968; September 1968; and October 1968. Until the October 1968 consultation, the defendants considered the plaintiff's visual problems to be related solely to complications associated with her contact lenses. On that occasion, the defendant, Dr. Carey, tested the plaintiff's eye pressure and field of vision for the first time. This test indicated that the plaintiff had glaucoma. The plaintiff, who was then 32 years of age, had essentially lost her peripheral vision and her central vision was reduced to approximately 5 degrees vertical by 10 degrees horizontal.

Thereafter, in August of 1969, after consulting other physicians, the plaintiff filed a complaint against the defendants alleging, among other things, that she sustained severe and permanent damage to her eyes as a proximate result of the defendants' negligence. During trial, the testimony of the medical experts for both the plaintiff and the defendants established that the standards of the profession for that specialty in the same or similar circumstances do not require routine pressure tests for glaucoma upon patients under 40 years of age. The reason the pressure test for glaucoma is not given as a regular practice to patients under the age of 40 is that the disease rarely occurs in this age group. Testimony indicated, however, that the standards of the profession do require pressure tests if the patient's complaints and symptoms reveal to the physician that glaucoma should be suspected.

The trial court entered judgment for the defendants following a defense verdict. The plaintiff thereupon appealed to the Court of Appeals, which affirmed the judgment of the trial court. *Helling v. Carey*, 8 Wn. App. 1005 (1973). The plaintiff then petitioned this court for review, which we granted.

In her petition for review, the plaintiff's primary contention is that under the facts of this case the trial judge erred in giving certain instructions to the jury and refusing her

proposed instructions defining the standard of care which the law imposes upon an ophthalmologist. As a result, the plaintiff contends, in effect, that she was unable to argue her theory of the case to the jury that the standard of care for the specialty of ophthalmology was inadequate to protect the plaintiff from the incidence of glaucoma, and that the defendants, by reason of their special ability, knowledge and information, were negligent in failing to give the pressure test to the plaintiff at an earlier point in time which, if given, would have detected her condition and enabled the defendants to have averted the resulting substantial loss in her vision.

██ We find this to be a unique case. The testimony of the medical experts is undisputed concerning the standards of the profession for the specialty of ophthalmology. It is not a question in this case of the defendants having any greater special ability, knowledge and information than other ophthalmologists which would require the defendants to comply with a higher duty of care than "that degree of care and skill which is expected of the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Pederson v. Dumouchel*, 72 Wn.2d 73, 79, 431 P.2d 973 (1967). The issue is whether the defendants' compliance with the standard of the profession of ophthalmology, which does not require the giving of a routine pressure test to persons under 40 years of age, should insulate them from liability under the facts in this case where the plaintiff has lost a substantial amount of her vision due to the failure of the defendants to timely give the pressure test to the plaintiff.

The defendants argue that the standard of the profession, which does not require the giving of a routine pressure test to persons under the age of 40, is adequate to insulate the defendants from liability for negligence because the risk of glaucoma is so rare in this age group. The testimony of the defendant, Dr. Carey, however, is revealing as follows:

Q. Now, when was it, actually, the first time any complaint was made to you by her of any field or visual field

problem? A. Really, the first time that she really complained of a visual field problem was the August 30th date. [1968] Q. And how soon before the diagnosis was that? A. That was 30 days. We made it on October 1st. Q. And in your opinion, how long, as you now have the whole history and analysis and the diagnosis, how long had she had this glaucoma? A. I would think she probably had it ten years or longer. Q. Now, Doctor, there's been some reference to the matter of taking pressure checks of persons over 40. What is the incidence of glaucoma, the statistics, with persons under 40? A. In the instance of glaucoma under the age of 40, is less than 100 to one per cent. The younger you get, the less the incidence. It is thought to be in the neighborhood of one in 25,000 people or less. Q. How about the incidence of glaucoma in people over 40? A. Incidence of glaucoma over 40 gets into the two to three per cent category, and hence, that's where there is this great big difference and that's why the standards around the world has been to check pressures from 40 on.

The incidence of glaucoma in one out of 25,000 persons under the age of 40 may appear quite minimal. However, that one person, the plaintiff in this instance, is entitled to the same protection, as afforded persons over 40, essential for timely detection of the evidence of glaucoma where it can be arrested to avoid the grave and devastating result of this disease. The test is a simple pressure test, relatively inexpensive. There is no judgment factor involved, and there is no doubt that by giving the test the evidence of glaucoma can be detected. The giving of the test is harmless if the physical condition of the eye permits. The testimony indicates that although the condition of the plaintiff's eyes might have at times prevented the defendants from administering the pressure test, there is an absence of evidence in the record that the test could not have been timely given.

Justice Holmes stated in *Texas & P. Ry. v. Behymer*, 189 U.S. 468, 470, 47 L. Ed. 905, 23 S. Ct. 622 (1903):

What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard

of reasonable prudence, whether it usually is complied with or not.

In *The T.J. Hooper,* 60 F.2d 737 (2d Cir. 1932), Justice Hand stated on page 740:

[I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. *Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.*

(Italics ours.)

Under the facts of this case reasonable prudence required the timely giving of the pressure test to this plaintiff. The precaution of giving this test to detect the incidence of glaucoma to patients under 40 years of age is so imperative that irrespective of its disregard by the standards of the opthalmology profession, it is the duty of the courts to say what is required to protect patients under 40 from the damaging results of glaucoma.

We therefore hold, as a matter of law, that the reasonable standard that should have been followed under the undisputed facts of this case was the timely giving of this simple, harmless pressure test to this plaintiff and that, in failing to do so, the defendants were negligent, which proximately resulted in the blindness sustained by the plaintiff for which the defendants are liable.

There are no disputed facts to submit to the jury on the issue of the defendants' liability. Hence, a discussion of the plaintiff's proposed instructions would be inconsequential in view of our disposition of the case.

The judgment of the trial court and the decision of the Court of Appeals is reversed, and the case is remanded for a new trial on the issue of damages only.

HALE, C.J., and ROSELLINI, STAFFORD, WRIGHT, and BRACHTENBACH, JJ., concur.

UTTER, J. (concurring)—I concur in the result reached by the majority. I believe a greater duty of care could be imposed on the defendants than was established by their profession. The duty could be imposed when a disease, such as glaucoma, can be detected by a simple, well-known harmless test whose results are definitive and the disease can be successfully arrested by early detection, but where the effects of the disease are irreversible if undetected over a substantial period of time.

The difficulty with this approach is that we as judges, by using a negligence analysis, seem to be imposing a stigma of moral blame upon the doctors who, in this case, used all the precautions commonly prescribed by their profession in diagnosis and treatment. Lacking their training in this highly sophisticated profession, it seems illogical for this court to say they failed to exercise a reasonable standard of care. It seems to me we are, in reality, imposing liability, because, in choosing between an innocent plaintiff and a doctor, who acted reasonably according to his specialty but who could have prevented the full effects of this disease by administering a simple, harmless test and treatment, the plaintiff should not have to bear the risk of loss. As such, imposition of liability approaches that of strict liability.

Strict liability or liability without fault is not new to the law. Historically, it predates our concepts of fault or moral responsibility as a basis of the remedy. Wigmore, *Responsibility for Tortious Acts: Its History*, 7 Harv. L. Rev. 315, 383, 441 (1894). As noted in W. Prosser, *The Law of Torts* § 74 (3d ed. 1964) at pages 507, 508:

> There are many situations in which a careful person is held liable for an entirely reasonable mistake. . . . in some cases the defendant may be held liable, although he is not only charged with no moral wrongdoing, but has not even departed in any way from a reasonable standard of intent or care. . . . There is "a strong and growing tendency, where there is blame on neither side, to ask, in view of the exigencies of social justice, who can best bear the loss and hence to shift the loss by creating liability where there has been no fault."

(Footnote omitted.) Tort law has continually been in a state of flux. It is "not always neat and orderly. But this is not to say it is illogical. Its central logic is the logic that moves from premises—its objectives—that are only partly consistent, to conclusions—its rules—that serve each objective as well as may be while serving others too. It is the logic of maximizing service and minimizing disservice to multiple objectives." Keeton, *Is There a Place for Negligence in Modern Tort Law?*, 53 Va. L. Rev. 886, 897 (1967).

When types of problems rather than numbers of cases are examined, strict liability is applied more often than negligence as a principle which determines liability. Peck, *Negligence and Liability Without Fault in Tort Law*, 46 Wash. L. Rev. 225, 239 (1971). There are many similarities in this case to other cases of strict liability. Problems of proof have been a common feature in situations where strict liability is applied. Where events are not matters of common experience, a juror's ability to comprehend whether reasonable care has been followed diminishes. There are few areas as difficult for jurors to intelligently comprehend as the intricate questions of proof and standards in medical malpractice cases.

In applying strict liability there are many situations where it is imposed for conduct which can be defined with sufficient precision to insure that application of a strict liability principle will not produce miscarriages of justice in a substantial number of cases. If the activity involved is one which can be defined with sufficient precision, that definition can serve as an accounting unit to which the costs of the activity may be allocated with some certainty and precision. With this possible, strict liability serves a compensatory function in situations where the defendant is, through the use of insurance, the financially more responsible person. Peck, *Negligence and Liability Without Fault in Tort Law, supra* at 240-41.

If the standard of a reasonably prudent specialist is, in fact, inadequate to offer reasonable protection to the plaintiff, then liability can be imposed without fault. To do so

under the narrow facts of this case does not offend my sense of justice. The pressure test to measure intraocular pressure with the Schiotz tonometer and the Goldman applanometer takes a short time, involves no damage to the patient, and consists of placing the instrument against the eyeball. An abnormally high pressure requires other tests which would either confirm or deny the existence of glaucoma. It is generally believed that from 5 to 10 years of detectable increased pressure must exist before there is permanent damage to the optic nerves.

Although the incidence of glaucoma in the age range of the plaintiff is approximately one in 25,000, this alone should not be enough to deny her a claim. Where its presence can be detected by a simple, well-known harmless test, where the results of the test are definitive, where the disease can be successfully arrested by early detection and where its effects are irreversible if undetected over a substantial period of time, liability should be imposed upon defendants even though they did not violate the standard existing within the profession of ophthalmology.

The failure of plaintiff to raise this theory at the trial and to propose instructions consistent with it should not deprive her of the right to resolve the case on this theory on appeal. Where this court has authoritatively stated the law, the parties are bound by those principles until they have been overruled. Acceptance of those principles at trial does not constitute a waiver or estop appellants from adapting their cause on appeal to such a rule as might be declared if the earlier precedent is overruled. *Samuelson v. Freeman*, 75 Wn.2d 894, 900, 454 P.2d 406 (1969).

FINLEY and HAMILTON, JJ., concur with UTTER, J.

Petition for rehearing denied July 31, 1974.