[No. 1368-2. Division Two. June 3, 1976.]

HUBERT A. MEEKS, *Appellant*, v. R. MARX,
*Respondent*.

Neil J. Hoff (of Hoff & Cross), for appellant.

Allan R. Billett (of Comfort, Dolack, Hansler, Hulscher, Rosenow, Burrows & Billett), for respondent.

REED, J.—Plaintiff Hubert A. Meeks appeals from a judgment of Pierce County Superior Court dismissing his medical malpractice complaint following a jury verdict in favor of defendant, Dr. Ralph Marx.

Plaintiff, a 62-year-old man, tending to obesity and with a history of diabetes and arteriosclerosis, first saw Dr. Marx, an orthopedic surgeon, in June of 1968 for treatment of a broken ankle. The treatment was successful and plaintiff did not see the doctor again until October 1968 when he experienced pain in his right knee. On this occasion Dr. Marx noted the presence of fluid on the knee and X rays revealed moderate osteoporosis.[1] On October 11, 1968, plaintiff fell at home, sustaining an oblique fracture of the distal portion of the right femur. On October 12 Dr. Marx performed open reduction surgery and affixed the bone ends with multiple screws. Plaintiff was discharged from the hospital November 9, 1968.

Despite continued observation and treatment, the leg did not heal properly, and on February 19, 1969, Dr. Marx again operated to install a metal plate with tibial bolt and perform bone grafts, after which plaintiff remained in the hospital until March 29, 1969. During this second surgery tissue samples were removed and submitted for laboratory analysis; a microscopic examination of the tissue produced negative results but bone fragments contained therein were subjected only to gross examination, the laboratory advising they would be retained for any further testing desired. Dr. Marx requested no further tests.

Approximately 10 days after the second operation plain-

---

[1] Osteoporosis, a condition of porosity or loss of density of the bone, is not to be confused with osteomyelitis, an infection of the bone marrow.

tiff developed a staphylococcus infection at the surgery site causing him pain, discomfort, and drainage after leaving the hospital, and requiring his readmission April 1, 1969. The infection was again treated with antibiotic drugs and he was released for home care April 24, 1969. Sometime in April a nurse observed a "pulsatile" in the midline of the abdomen; this was noted on plaintiff's chart, but Dr. Marx did not observe the entry nor did he ever diagnose presence of an abdominal aneurysm. He testified discovery of such an aneurysm, if it existed, would not have prompted any change in treatment.

In May 1969 plaintiff complained of discomfort in his knee and was readmitted to the hospital May 6, 1969, for removal of the tibial bolt. This was done on May 7, Dr. Marx removing the bolt through a small incision in the side of the leg opposite from the fracture site. Plaintiff remained in the hospital for further treatment of the infection until June 25, 1969. Sometime in April or May Dr. Marx "suspected" the presence of osteomyelitis but X rays and other tests were completely negative except for a hospital report of May 28, 1969, interpreting a sinogram (dye injection) showing:

> No progressive involvement of bone by osteomyelitis is seen although chronic low-grade osteomyelitis may certainly be present . . .

A second sinogram performed in defendant's office in June 1969 revealed no evidence whatever of bone involvement.

Dr. Marx testified his suspicions of osteomyelitis were thus never confirmed, and he elected not to reopen the leg and go into the fracture site in search of it because this would almost certainly introduce the infection to the bone if it were not already there. He further testified treatment would involve removal of the metal plate, resulting in nonunion of the fracture, a procedure described as "life-threatening." Dr. Marx never informed plaintiff of his "suspicions" of osteomyelitis, but continued to treat the infection with drugs and shallow surgery. In August 1969, because X rays revealed the fracture had not reunited properly and

because the infection persisted, Dr. Marx referred plaintiff to University of Washington Hospital in Seattle for further diagnosis and treatment. Plaintiff was admitted immediately to University Hospital, and approximately 2 weeks later the afflicted leg was amputated.[2]

Plaintiff brought suit in Pierce County Superior Court, contending defendant was negligent in not diagnosing osteomyelitis, in not informing plaintiff he probably had that disease, in failing to treat plaintiff properly, and in abandoning plaintiff as a patient. At trial plaintiff relied entirely for medical proof of defendant's negligence on the testimony of Dr. Alan H. Sobul, a general practitioner with a pathology background, but with no special training or experience in orthopedics or surgery. Dr. Sobul's testimony was based almost entirely on medical texts and authorities he had read at the request of plaintiff's attorney solely in order to testify. He admitted on cross-examination he was not familiar with the ordinary standard of medical care for orthopedic surgeons during the treatment period of 1968-69. Defense witnesses, in addition to Dr. Marx, were two Tacoma physicians, one specializing in thoracic and vascular surgery and the other in orthopedic surgery. Both testified that Dr. Marx had not deviated from the proper standards of medical care and treatment in his ministrations to plaintiff. The jury returned a verdict for defendant and this appeal followed.

Plaintiff's assignments of error are: (1) the trial court erred in not properly instructing the jury on the standard of care owed by a physician to his patient; (2) the court

---

[2]Plaintiff's position at trial was that University Hospital doctors found an abdominal aortic aneurysm which had to be operated to save plaintiff's life, requiring prior amputation of the chronically infected leg. Plaintiff presented no witnesses who could testify directly to the diagnosis and treatment at University Hospital, nor did he offer any medical records to establish these facts. It is questionable whether he was successful in doing so through questions put to Doctors Sobul, Marx, Wickstrom and Zimmerman. For purposes of this opinion, therefore, we are assuming plaintiff had osteomyelitis and an aneurysm and that there was a causal relationship between these conditions and removal of the leg.

erred in not instructing on the theory of res ipsa loquitur; (3) the court erred in rejecting plaintiff's proposed instructions on a physician's duty to (a) discover a condition, (b) inform his patient of treatment risks, and (c) stay abreast of progress and modern treatment methods; and (4) the court erred in restricting the scope of pretrial discovery depositions of medical experts and in setting witness fees therefor. We resolve all issues raised by these assignments in defendant's favor and affirm the judgment.

█ Plaintiff first asserts the court's instruction No. 7 erroneously defined the geographical locality to be considered in determining the appropriate standard of care by limiting it to Pierce County when it told the jury:

> You are instructed that the defendant should be held to the standards of practice of the average physician and surgeon specializing in orthopaedic surgery in an area coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of a person such as the plaintiff living in the Pierce County area during the time involved.

This instruction correctly stated the law. In *Pederson v. Dumouchel*, 72 Wn.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967), our Supreme Court abandoned the "locality rule" as having "no present-day vitality" except as one element to be considered in determining the standard of care and skill to be expected of a physician. In its stead the court, speaking through Justice Weaver, expanded the area to be looked to as follows:

> A qualified medical or dental practitioner should be subject to liability, in an action for negligence, if he fails to exercise that degree of care and skill which is expected of the average practitioner in the class to which he belongs, acting in the same or similar circumstances. This standard of care is that established in an area coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the patient.

*Pederson v. Dumouchel, supra* at 79. Instruction No. 7 is couched in the exact language of the *Pederson* rule, trans-

lated into terms specifically applying to plaintiff as a resident of Pierce County. As given, the instruction permitted the jury to properly consider evidence of the standard of care not only in Pierce County but in any center, such as Seattle, Portland, Oregon, or even San Francisco, California, if evidence established such cities to be "readily accessible centers" for treatment of a Pierce County resident. Plaintiff contends, although he proposed no instruction to that effect, that there should be no restriction whatever on the area to be canvassed and that it should extend "throughout the nation." We think not, because, as stated in *Pederson* at page 79:

> In England, the same standard is applicable throughout the country. The extent of our country is such, however, that we hestitate to fix a definite geographic limit upon the standard of care—be it statewide or expanded to the Pacific Northwest, as suggested by plaintiff's requested instruction.

The very value of the *Pederson* rule lies in its amenability to contraction or expansion in each case, depending on the proofs adduced. We therefore decline any invitation to define the area in geographical terms, be they broad or narrow.

Plaintiff next claims instruction No. 7 imposed an incorrect standard of care, asserting that under *Helling v. Carey*, 83 Wn.2d 514, 519 P.2d 981 (1974), a higher standard than "ordinary care" is required of a physician in every case. Plaintiff argues that Dr. Marx could have diagnosed the presence of osteomyelitis either by reopening the leg and going down to the bone, or by subjecting the bone samples to further analysis. In *Helling* the court imposed a higher standard of care upon an opthalmologist who failed to give a simple pressure test which would have revealed the presence of glaucoma. In that case, even though the ordinary standard of care did not dictate administration of such a test to persons under 40 years of age, in the absence of other positive symptoms of glaucoma, the court imposed liability as a matter of law, saying at pages 518-19:

There is no judgment factor involved, and there is no

doubt that by giving the test the evidence of glaucoma can be detected. The giving of the test is harmless if the physical condition of the eye permits. . . . there is an absence of evidence in the record that the test could not have been timely given.

. . .

Under the facts of this case reasonable prudence required the timely giving of the pressure test to this plaintiff. The precaution of giving this test . . . is so imperative that irrespective of its disregard by the standards of the opthalmology profession, it is the duty of the courts to say what is required . . .

We have carefully considered plaintiff's contention and the effects our decision would surely have upon other cases yet to be decided were we to attempt to formulate a rule of general application from *Helling* and apply it to the facts of this case. A thorough analysis of that decision leads us to conclude the holding there was intended to be restricted solely to its own "unique" facts, *i.e.*, cases in which an opthalmologist is alleged to have failed to test for glaucoma under the same or similar circumstances. Such is not the case before us. In any event, in light of the sharply conflicting medical testimony in the record before us, we cannot say as did the *Helling* court at page 519: "There are no disputed facts to submit to the jury on the issue of the defendants' liability."[3]

■ Plaintiff next assigns error to the giving of instruction No. 10, contending it places the burden of proof on the wrong party, *i.e.*, the plaintiff, when at the least the doctrine of res ipsa loquitur, and at the most that of strict

---

[3]RCW 4.24.290, enacted as Laws of 1975, 1st Ex. Sess., ch. 35, effective September 8, 1975, requires a plaintiff in a medical malpractice case to "prove by a preponderance of the evidence that the defendant or defendants failed to exercise that degree of skill, care and learning possessed by other persons in the same profession . . ." According to the *Washington House Committee on the Judiciary*, report on Substitute House Bill 246 (March 24, 1975), this legislation was a direct result of the decision in *Helling v. Carey*, 83 Wn.2d 514, 519 P.2d 981 (1974), its purpose being to reestablish pre-*Helling* standards of negligence. *See also* 51 Wash. L. Rev. 167 (1975) and 10 Gonzaga L. Rev. 220 (1974).

liability, ought to apply. Plaintiff's argument not only presupposes that his evidence shows *inter alia* that plaintiff sustained an injury that ordinarily would not have occurred without negligence, *Miller v. Kennedy*, 11 Wn. App. 272, 522 P.2d 852 (1974), *aff'd*, 85 Wn.2d 151, 530 P.2d 334 (1975), and on that we disagree, but plaintiff failed to present these theories to the trial court, either by way of exception to the court's instruction or by including them in his own proposed instructions. In fact, in response to the exception to instruction No. 10, the trial court added the very words suggested by plaintiff. We need not consider this assignment.

Plaintiff next challenges the trial court's refusal to give his proposed instruction No. 10,[4] arguing that he was entitled to have the jury instructed on the doctrine of "informed consent." *Miller v. Kennedy, supra.* We disagree. The evidence in this case would not support the giving of an instruction on that theory, which deals with a physician's duty to inform his patient of grave risks of *collateral injury*, reasonably to be expected in undergoing a *proposed* course of treatment so that the patient may decide for himself the course he will pursue. *ZeBarth v. Swedish Hosp. Medical Center*, 81 Wn.2d 12, 499 P.2d 1, 52 A.L.R.3d 1067 (1972). Dr. Marx knew only that plaintiff had a severe chronic staphylococcus infection. He was never medically certain plaintiff had osteomyelitis nor did he diagnose an aneurysm, and there was therefore nothing he could put to the plaintiff in the way of an election. Ultimate loss of the limb in this case, just as any other undesirable result, lay in the realm of speculation and conjecture. Adoption of plaintiff's theory of a duty to disclose that "possibility" would effectively negate the rule that mere complications or an

---

[4]Proposed instruction No. 10 stated:

"You are instructed that a physician or surgeon is in a position of trust and confidence with regard to his patient and if he knows or should know that the treatment which he is capable of giving will not be adequate, the doctor has the duty to advise his patient. Similarly if he knows or should know that a specialist is required to effectuate proper treatment to the patient, it is the duty of the doctor to so advise the patient."

undesired result standing alone, without proof of negligence, and absent a res ipsa loquitur fact situation, do not create or permit any inference of fault on the part of the treating physician. *Richison v. Nunn*, 57 Wn.2d 1, 340 P.2d 793 (1959); *Crouch v. Wyckoff*, 6 Wn.2d 273, 107 P.2d 339 (1940). Additionally, plaintiff's proposed instruction is deficient because it does not apprise the jury of the appropriate standards for determining the existence and scope of the duty to inform nor of the many other factors to be considered in applying the doctrine. *ZeBarth v. Swedish Hosp. Medical Center, supra.*[5]

 Plaintiff also contends the trial court erred in giving instruction No. 9, reading as follows:

> A physician or surgeon is not to be judged in the light of any after acquired knowledge in relation to the case, and the question of whether or not he exercised reasonable care and skill as defined in these instructions, is to be determined by reference to what is known in relation to the case at the time of treatment or examination, and must be determined by reference to the pertinent facts then in existence of which he knew, or in the exercise of ordinary care should have known.

and committed additional error in not accepting plaintiff's proposed instruction No. 9, which reads as follows:

> You are instructed that a physician and surgeon owes a duty to keep abreast of progress and modern methods of diagnosis and treatment to the extent that he shall possess that degree of skill and learning that is possessed by reputable physicians and surgeons who are practicing under the same or similar circumstances and at or about the same time.

These assignments, too, are without merit. Instruction No. 9 is a correct statement of the law. *Peacock v. Piper*, 81 Wn.2d 731, 504 P.2d 1124 (1973); *Winsor v. Smart's Auto Freight Co.*, 25 Wn.2d 383, 171 P.2d 251 (1946). We think it was particularly apt in view of Dr. Sobul's reliance on texts

---

[5]Laws of 1975, 2d Ex. Sess., ch. 56 (RCW 4.24.240) sets forth the necessary elements of proof in cases alleging a breach of a duty to secure an informed consent to "health care" treatment. The effective date of this legislation is June 25, 1976.

and authorities published after 1970, in testifying what he thought the treatment should have been. Plaintiff's treatment commenced in 1968 and terminated in 1969. There was no evidence that Dr. Marx failed to keep abreast of medical progress, current during the treatment period. Plaintiff's proposed instruction No. 9 was properly refused. We should add that such an instruction appears to run counter to the accepted assumption that a duly licensed physician is possessed of the requisite skill and knowledge to practice his profession. *Peacock v. Piper, supra.*

We have carefully reviewed plaintiff's remaining assignments of error directed to the refusal to give certain additional instructions and we find the subject matter adequately covered by the instructions given. The giving of further instructions rested within the sound discretion of the trial court. *Peacock v. Piper, supra.*

Finally, we are asked to reverse because the trial judge limited the scope of examination by deposition of certain doctors and allegedly established exorbitant fees to be paid them. Plaintiff did not seek the depositions until 1 week before trial and our review of the record convinces us the trial court acted well within its discretion. CR 26 (b) (4) (A) (i).

Judgment affirmed.

PETRIE, C.J., and PEARSON, J., concur.