[No. 4980–1. Division One. March 19, 1979.]

CLAUDE J. LEBEUF, ET AL, *Appellants*, v. JOHN H. ATKINS, ET AL, *Respondents*.

*Bonjorni, Harpold & Fiori*, by *Duncan A. Bonjorni* and *Jerry Schumm*, for appellants.

*Davies, Pearson, Anderson, Seinfeld, Gadbow, Hayes & Johnson*, by *Larry E. Levy*, for respondents.

DORE, J.—Plaintiffs LeBeuf sued the defendants for damages based on malpractice. The trial judge granted a summary judgment of dismissal as to the defendant oral surgeon Atkins and his wife. Plaintiffs appeal.

## ISSUE

Did the trial court err in granting a summary judgment of dismissal for the defendant dentist?

Answer: Yes.

## FACTS

From the complaint, affidavits and plaintiffs' answers to defendants' interrogatories, the following factual basis was established for purposes of this appeal.

On May 19, 1972, plaintiff Claude J. LeBeuf was driven by his wife to the office of the defendant Dr. John H. Atkins, D.D.S., for the removal of an impacted wisdom tooth. LeBeuf had been suffering from severe headaches prior to this date and had a severe headache the day he was taken to Dr. Atkins' office. The day prior to the extraction, plaintiff had described his headache as feeling like his "head was exploding." Plaintiff himself did not know if he had high blood pressure or hypertension and he had not been diagnosed as having such problems.

Dr. Atkins did not check plaintiff's blood pressure although he was competent to take blood pressure and it would have taken him only minutes to complete the test. Prior to the extraction, at the request of the defendant, plaintiff completed a written questionnaire, designated herein as a medical history. The defendant subsequently injected the plaintiff with xylocaine, a local anesthetic containing epinephrine, which is a vasoconstrictor. He then performed the oral surgery.

After the operation plaintiff was taken to a recovery room and was covered with a blanket. Plaintiff's wife, Jean LeBeuf, who remained with plaintiff throughout the period of time he was lying down, testified by affidavit that she then observed the plaintiff suffering from fever and chills and he appeared disoriented. "His eyes were staring blankly and when I moved my hand in front of his eyes and toward his face, there was no reaction by him at all." Plaintiff was then assisted to his car by his wife and defendant, where he became ill, vomiting on two occasions. Plaintiff was then taken home and put to bed.

The following morning when his condition worsened, plaintiff was taken to the hospital, where he was admitted on a preliminary diagnosis of cerebral hemorrhage or stroke. He is presently totally disabled and unable to work.

During this post–surgical period, defendant failed to give any instructions or treat plaintiff.

Plaintiff sued defendants for damages, alleging malpractice in Dr. Atkins' failure to determine that he was suffering from hypertension and/or high blood pressure at the time that he was injected with xylocaine which drug he claims brought on his stroke. Plaintiff also contends that the defendant knew or should have known of the risks involved in injecting xylocaine into a patient suffering from hypertension and/or high blood pressure and that he failed to inform the plaintiff of the risks involved in this procedure. Plaintiff further contends that the defendant dentist was negligent in his post–operative treatment of plaintiff.

## DECISION

We reverse the summary judgment of dismissal.

The undisputed facts in the record before the trial court were as follows:

1. There was nothing in the medical history taken from plaintiff, via medical questionnaire by Dr. Atkins, to protect a person from high blood pressure, hypertension and/or cardiovascular disease which had not been diagnosed and treated, or was not under a doctor's care.

2. Dr. Atkins did not check plaintiff's blood pressure, a procedure of a few minutes duration, to determine whether plaintiff suffered from hypertension and/or high blood pressure.

3. Defendant doctor failed to advise plaintiff of the potential risks involved in the use of an anesthetic with a vasoconstrictor.

Plaintiff's wife related her husband's medical condition on the day prior to the operation as well as the day of the operation in her affidavit as follows:

The day before he went to see Dr. Atkins, he had complained to me about feeling extreme pressure in his head, making the comment that it "felt like his head was exploding." I know that he had been under severe strain and tension during this period of time, and felt that this was due to the pressure of his business.

On the day he saw Dr. Atkins, I went with him into the office. I was not present when he was asked about his medical history, and his physical condition, but I did talk with Dr. Atkins' nurse and Dr. Atkins and advised them that Claude was allergic to penicillin and sulfa compounds. I remained in the waiting room while the surgery was performed, and then was called into a back room where Claude was lying on a couch, covered with a blanket. He was at that time suffering from fever and chills, and appeared quite disoriented. His eyes were staring blankly, and when I moved my hand in front of his eyes and toward his face, there was no reaction by him at all, either in his eyes or otherwise. He did not appear to respond to anything, except that when I asked him how he was or how he felt, his only response, in a rather weak voice, was that "he wanted to go home." It was necessary for myself and Dr. Atkins to assist Claude to the car, as he was very weak and suffering considerably at this time. Once in the car, he became ill, and I went back into Dr. Atkins' office to obtain a towel to clean him up. He became ill again on the way home.

Plaintiffs produced the following testimony on the issue of standard of professional care of a dentist:

1. The Physicians Desk Reference contains warnings about the use of xylocaine containing epinephrine with patients suffering from hypertension, high blood pressure, or cardiovascular disease.

2. Plaintiff produced an affidavit from *Dr. Robert Tuby, M.D.*, a medical doctor with a long list of medical accreditations. Dr. Tuby stated that in making his medical evaluation of causation in the subject case, he reviewed plaintiff's medical records, including the following materials:

(a) The medical records of plaintiff from Lakewood General Hospital and Tacoma General Hospital;

(b) The depositions of Drs. Atkins, Ellingson and Crabill and Mr. and Mrs. LeBeuf;

(c) The affidavits of Dr. David Moline, D.D.S. and Mrs. LeBeuf;

(d) The Physicians Desk Reference with respect to the drug xylocaine manufactured by Astra Pharmaceutical Products, Inc.

Dr. Tuby concluded in his affidavit:

That it is his opinion that Claude LeBeuf was probably suffering from hypertension accompanied by high blood pressure at the time he was operated on by Dr. Atkins, and that the injections of Xylocaine with epinephrine probably caused the ensuing damage to Claude LeBeuf's central nervous system and it is more likely than not that this resulted in a subarachnoid hemorrhage.

3. *Dr. David O. Moline, D.D.S.,* a graduate of the University of Washington Dental School and who is licensed to practice dentistry in Washington, Oregon and British Columbia, testified via affidavit. He related that he had practiced dentistry in the state of Washington for 21 years from 1953 to 1974, with the last 17 years in Olympia, Washington; that currently he is an associate professor at L.S.U. Medical Center School of Dentistry, and director of the general dentistry residency program at Charity Hospital, New Orleans, and L.S.U. Medical Center. He states that he formerly was in a group practice at Olympia, Washington, and in 1972 was familiar with what were the accepted standards of practice of the dental profession in western Washington. He alleges that he reviewed the testimony of Drs. Atkins, Ellingson and Crabill, and Mr. and Mrs. LeBeuf, and concluded

THAT, he has reviewed Dr. Atkins's record of the procedure and the questionnaire Mr. LeBeuf was asked to fill out.

THAT, it is his opinion that the pre–anesthetic history obtained by Dr. Atkins was not adequate in that he omitted to determine whether the patient had hypertension or high blood pressure and the failure to do this was not consistent with the accepted standard of care among the dental profession in western Washington in 1972.

■ The affidavits of Drs. Tuby and Moline, and Mrs. LeBeuf, and the answers to interrogatories of the plaintiff, in the aggregate most certainly raise a factual issue as to whether the defendant Atkins satisfied "that degree of care and skill which is expected of the average practitioner in the class to which he belongs, acting in the same or similar

circumstances." *Pederson v. Dumouchel,* 72 Wn.2d 73, 79, 431 P.2d 973, 31 A.L.R.3d 1100 (1967); *Meeks v. Marx,* 15 Wn. App. 571, 550 P.2d 1158 (1976); *Swanson v. Brigham,* 18 Wn. App. 647, 651, 571 P.2d 217 (1977).

From the report of proceedings it is clear that the trial court considered only the affidavits of Drs. Tuby and Moline and that portion of plaintiff's deposition in which he states he was unaware that he had any blood pressure problems, and ruled as a matter of law that even if the defendant dentist had inquired concerning plaintiff's history of prior high blood pressure and/or hypertension, as plaintiff had no prior knowledge of such a history, a proper medical questionnaire would not have elicited this information. The trial court summarized:

[A] conclusion by a doctor that the history wasn't adequate but a record which shows that had an adequate history been taken, it wouldn't have changed the picture, the history would have been that he had no high blood pressure. The motion is granted.

However, the trial judge completely misconstrued Dr. Moline's testimony in his affidavit, and all inferences from it. Dr. Moline stated:

THAT, he has reviewed Dr. Atkins's record of the procedure and the questionnaire Mr. LeBeuf was asked to fill out.

THAT, it is his opinion that the pre-anesthetic history obtained by Dr. Atkins was not adequate in that he omitted to determine whether the patient had hypertension or high blood pressure and the failure to do this was not consistent with the accepted standard of care among the dental profession in western Washington in 1972.

From that testimony it is clear that Dr. Moline not only stated that the standard of care of a dentist at the time of the incident was a proper medical questionnaire, but he went further and stated that Dr. Atkins had a definitive duty to determine whether the patient had hypertension or high blood pressure and his failure to do this was not consistent with the accepted standard of care among the dental profession in western Washington in 1972. Presumably to

determine plaintiff's high blood pressure and/or hypertension, it was mandatory that the defendant dentist should have taken the blood pressure of plaintiff, a simple test of a few minutes' duration. Dr. Moline stated the standard of care is for a dentist to find affirmatively whether the patient had blood pressure problems, and if you don't discover it you proceed at your own risk in injecting a patient with xylocaine containing epinephrine.

The obvious interpretation of Dr. Moline's affidavit was that Dr. Atkins failed to determine whether the plaintiff had high blood pressure problems and injected him with xylocaine containing epinephrine anyway, and according to the affidavit of Dr. Tuby, plaintiff's stroke ensued. This most certainly raises a question of fact as to whether the defendant's failure to detect plaintiff's heart condition problems was malpractice.

### INFORMED CONSENT

In addition to the factual issues based upon the standard of care of a dentist during 1972, there is the additional factual issue of whether plaintiff was informed of the risk involved in administering the anesthetic in question. This also is a factual question for the jury.

Enactment of RCW 4.24.290, Laws of 1975, 1st Ex. Sess., ch. 35, § 1, p. 252, had no impact on the doctrine of informed consent of a patient, as such doctrine is specifically excluded from this statute.

RCW 4.24.290 (Substitute House Bill 246) as passed, provided:

> NEW SECTION. Section 1. There is added to chapter 4.24 RCW a new section to read as follows:
> In any civil action for damages based on professional negligence against a hospital which is licensed by the state of Washington or against the personnel of any such hospital, or against a member of the healing arts including, but not limited to, a physician licensed under chapter 18.71 RCW, an osteopathic physician licensed under chapter 18.57 RCW, a chiropractor licensed under chapter 18.25 RCW, a dentist licensed under chapter 18.32 RCW, a podiatrist licensed under chapter 18.22 RCW, or

a nurse licensed under chapters 18.78 or 18.88 RCW, the plaintiff in order to prevail shall be required to prove by a preponderance of the evidence that the defendant or defendants failed to exercise that degree of skill, care and learning possessed by other persons in the same profession and that as a proximate result of such failure the plaintiff suffered damages, *but in no event shall the provisions of this section apply to an action based on the failure to obtain the informed consent of a patient.*

(Italics ours.)

The doctrine of informed consent requires the physician to disclose to the patient the risks of the treatment, the risks of alternate treatments available, the risk attendant to each, as well as the risk attendant to no treatment at all.

In *Miller v. Kennedy*, 11 Wn. App. 272, 522 P.2d 852 (1974), the court discussed the doctrine of informed consent at pages 282–86:

> The scope of the duty to disclose information concerning the treatment proposed, other treatments and the risks of each course of action and of no treatment at all is measured by the patient's need to know. The inquiry as to each item of information which the doctor knows or should know about the patient's physical condition is "Would the patient as a human being consider this item in choosing his or her course of treatment?" *Cobbs v. Grant* [8 Cal. 3d 229, 502 P.2d 1, 104 Cal. Rptr. 505 (1972)] referring to the *Canterbury* case [*Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972)] states on page 243:
>
> > The court in *Canterbury v. Spence, supra,* 464 F.2d 772, 784, bluntly observed: "Nor can we ignore the fact that to bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician alone. Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves." Unlimited discretion in the physician is irreconcilable with the basic right of the patient to make the ultimate informed decision regarding the course of treatment to which he knowledgeably consents to be subjected.

Indeed, it is the prerogative of the patient to choose his treatment. A doctor may not withhold from the patient the knowledge necessary for the exercise of that right. Without it, the prerogative is valueless. *Canterbury v. Spence, supra* at 781, 782, 786.

The burden of proving that a physician failed to inform the plaintiff–patient of the available courses of treatment or failed to warn of the consequential hazards of each choice of treatment is on the plaintiff. It is the plaintiff who must initially establish the existence of the elements of an action based on the informed consent doctrine, *i.e.*, the existence of a material risk unknown to the patient, the failure to disclose it, that the patient would have chosen a different course if the risk had been disclosed and resulting injury. *Canterbury v. Spence, supra* at 791; *Mason v. Ellsworth* [3 Wn. App. 298, 474 P.2d 909 (1970)], *supra* at 312; *Trogun v. Fruchtman,* 58 Wis. 2d 596, 604, 207 N.W.2d 297, 314 (1973). The burden of proving a defense when failure to disclose has been established is on the doctor. *Canterbury v. Spence, supra* at 791; *Cobbs v. Grant, supra* at 245. *Trogun* on page 604 places the burden of proof upon the parties as follows:

We conclude that the burden of proof is on the plaintiff to establish a physician's failure to disclose particular risk information in connection with contemplated treatment, the patient's lack of knowledge of that risk and the adverse effects upon him which followed that treatment. . . . Once the plaintiff has established a prima facie showing of a failure of the physician to inform the patient, the physician must come forward with his explanation of the reasons for not so informing the patient, including evidence that such advice was not customarily given.

(Footnotes omitted.)

Those elements which are the province of the medical profession must be established by the testimony of medical experts in the field of inquiry. Thus, the existence of the risks and alternatives which were present in the particular physical condition would be beyond the knowledge of the layman and would have to be established by medical testimony. On the other hand, those matters which are not within the special province of the training and experience of doctors may be established by the tes-

timony of any witness with knowledge of the particular inquiry, such as whether the patient knew of the risk or whether the average patient would consider the risk in making a decision. *Trogun v. Fruchtman, supra* at 604. There is no need to prove what other doctors might tell their patients in similar circumstances. The doctor has a duty to disclose the material risks as a matter of law. The testimony of medical experts is not necessary to establish the duty to disclose that which the law requires. Once the existence of a risk has been established by expert medical testimony, there is no need to take the next step and also prove by expert medical testimony that the doctor should have told the patient about the risk. Once it has been established by expert medical testimony that a risk existed, then the existence of the risk is the patient's business; and it is not for the medical profession to establish a criteria for the dissemination of information to the patient based upon what doctors feel the patient should be told. *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972); *Mason v. Ellsworth, supra. See also* Comment, *A New Standard for Informed Consent in Medical Malpractice Cases—The Role of the Expert Witness,* 18 St. Louis Univ. L.J. 256 (1973). The patient has a right to know and the doctor has the duty to inform the patient whether the doctor wants to or not. *The fiduciary duty of the doctor requires disclosure.* There is no room for paternalism or for overprotectiveness. . . .

(Footnotes omitted. Italics ours.) The decision of the Court of Appeals in *Miller v. Kennedy, supra,* was approved and adopted in a per curiam opinion of the Supreme Court at 85 Wn.2d 151, 530 P.2d 334 (1975).

The risk that plaintiff was exposed to was established by the affidavits of Drs. Tuby and Moline, as required by *Miller v. Kennedy, supra.*

In the subject case the patient was obviously unaware of the possible side effects of epinephrine and that a reasonable alternative—the use of an anesthetic without the vasoconstrictor was available.

If Dr. Atkins did not inform the plaintiff of the risks involved in injecting xylocaine into his body and this injection caused his resultant stroke and total disability, this is

medical malpractice, and Dr. Atkins must be held responsible. The plaintiff said the defendant did not inform him. This is a factual issue and must be resolved by the jury.

If Dr. Atkins had told the plaintiff that by injecting him with xylocaine, a local anesthetic containing epinephrine, preparatory to pulling his wisdom tooth, he was running the risk of a stroke or even death if he was suffering from hypertension or high blood pressure, plaintiff most assuredly would not have proceeded unless he had the answers to other questions. These questions undoubtedly would have been:

1. Can I be sure that I don't have hypertension or high blood pressure?

2. Is there any test you can perform to definitely determine my physical condition?

3. Is there an alternative drug you can use?

4. Is it really necessary to pull my wisdom tooth?

5. Will you please test my blood pressure so we can definitely determine whether I have high blood pressure?

Any ordinary person properly informed of the risks in the subject case unless he knew for a certainty he did not have hypertension or high blood pressure, would say no, do not inject me with xylocaine or do not pull my wisdom tooth. In any event, he has the right to be informed and it is his decision to say yes or no, not the doctor's.

Here, a simple test of a few minutes' duration which Dr. Atkins presumably was capable of administering, would have informed the defendant that plaintiff had high blood pressure. Clearly, under *Miller v. Kennedy, supra,* plaintiff was entitled to be informed of this "simple" test which possibly might have prevented his stroke and resultant disability.

Plaintiff pleaded alternative theories of negligence on Dr. Atkins' post–surgery treatment, as follows:

A. Failing to inform plaintiff of risks inherent in the surgical procedures performed by the defendant on the 19th of May 1972.

B. Failing to treat and observe the plaintiff subsequent to the surgery performed.

C. In discharging the plaintiff at a time when he was getting worse instead of better.

D. Failure to obtain treatment and/or institute any corrective procedures upon learning of plaintiff's condition.

E. Failure to advise plaintiff as to the possible side effects of xylocaine and corrective procedures necessary to minimize side effects.

I. In doing a surgical procedure which the defendant was not competent to do.

Mrs. LeBeuf, in her affidavit, relates that when she arrived following the operation, her husband was

lying on a couch, covered with a blanket. He was at that time suffering from fever and chills, and appeared quite disoriented. His eyes were staring blankly, and when I moved my hand in front of his eyes and toward his face, there was no reaction by him at all . . .

Mrs. LeBeuf also stated that although her husband was deathly ill following the operation, Dr. Atkins refused to render any medical assistance but insisted he be immediately taken home. At home it is alleged that defendant refused to offer any medical help or suggest that plaintiff be taken to the hospital. Plaintiff further alleges in his complaint that Dr. Atkins' actions amounted to willful and wanton misconduct evidencing total indifference to plaintiff's post–surgical recovery and that such conduct evidenced a reckless indifference to the welfare and rights of the plaintiff. From Mrs. LeBeuf's affidavit, there is a definite inference that Dr. Atkins did not perform his professional skills following the operation when it was obvious that plaintiff had suffered a stroke and needed medical help with the care, skill and learning possessed by other members of the dental profession. As a result, it is claimed that plaintiff was more severely damaged than he would have been had he had proper post–surgical care. There is no direct testimony from any dentist on the "standard of care" to be rendered post–operatively on a wisdom tooth extraction by either party. However, the pleadings and Mrs.

LeBeuf's affidavit raise an inference that plaintiff did not receive proper care post–operatively and, therefore, a summary judgment of dismissal on this issue may not be granted. The trial court failed to dispose of this factual issue or to rule on it one way or the other.

For the purposes of summary judgment, we must review materials submitted for and against a motion for summary judgment in a light most favorable to the party against whom the motion is made, and when evidence is so considered, if reasonable men might reach different conclusions, the motion should be denied. *Duffy v. King Chiropractic Clinic,* 17 Wn. App. 693, 565 P.2d 435 (1977).

In summary, we conclude that the trial court erred in granting summary judgment as to the defendant dentist and his wife for the following reasons:

### GENERAL NEGLIGENCE

There are disputed facts on the issue "whether the standard of care" and skill required of a dentist in 1972 was fulfilled by merely inquiring of the patient whether or not he had any prior high blood pressure problems or whether the standard of care required an affirmative determination whether the patient had hypertension and/or high blood pressure problems before injection of an anesthetic known as xylocaine with epinephrine. Dr. Moline's affidavit definitely raises this issue. On a motion for summary judgment, a nonmoving party is entitled to all inferences from the evidence, not vice versa. The conflicting evidence on "standard of care" should be resolved by the jury.

### INFORMED CONSENT

The medical risks involved in injecting xylocaine, containing epinephrine, were established by medical testimony in the record. The defendant dentist admittedly failed to inform the plaintiff of such risks, which plaintiff was entitled to know. This evidence raises factual issues on "informed consent" which can only be resolved by the trier of the facts.

## POST–OPERATIVE NEGLIGENCE

There is medical evidence in the various affidavits of Mrs. LeBeuf, Dr. Tuby and Dr. Moline to raise an inference of defendant's negligence in post–operative care and treatment, which the trial court does not even discuss and which issue remains unresolved. This is also a factual issue which cannot be determined by the court as a matter of law.

We reverse and remand for trial in accordance with this opinion.

CALLOW, C.J. (concurring)—I concur in the result which remands the cause to the trial court for trial on the merits. The evidence must be viewed in the light most favorable to the nonmoving party. The evidence presented raises a material question as to whether the standard of care of the dental profession requires a dentist to ascertain if a patient has high blood pressure before administering xylocaine containing epinephrine. This question should not be resolved upon affidavits, depositions and exhibits, but by the presentation of live testimony and the consideration of such other evidence as may properly come on before a court during trial.

ANDERSEN, J. (dissenting)—As one court has expressed it, "[t]he hardship of the particular case is no reason for melting down the law." *Southern Star Lightning Rod Co. v. Duvall*, 64 Ga. 262, 268 (1879).

I dissent from the majority opinion on three grounds:

1. The facts upon which that opinion is based are not necessarily the facts of this case at all.

2. The plaintiff patient did not establish, as he is required by statute to do, that the defendant dentist failed to exercise the standard of care required of members of the dental profession.

3. Where the patient had assured the dentist that he was in good health, and where neither the patient nor the dentist was aware that the patient had high blood pressure (as

it was later theorized that he had), the dentist did not violate the informed consent doctrine by failing to inform the patient that there was an element of risk in administering the local anesthetic to persons with high blood pressure.

## GROUND 1

Since this is a review of a summary judgment in the dentist's favor in the trial court, the following rule enunciated by the State Supreme Court is applicable:

> In an appellate review of a summary judgment entered pursuant to Rule of Pleading, Practice and Procedure 56, RCW Vol. 0, this court can review only those matters that have been presented to the trial court for its consideration before entry of the summary judgment. The matters considered may be certified to this court by either of two methods, or a combination of them. First, they may be incorporated in a statement of facts certified by the trial court; second, they may be identified with particularity in the summary judgment signed by the trial court and then furnished to this court by transcript certified by the clerk of court. The reason is obvious: it would be unfair to consider, on appellate review, matters not presented to the trial court for its consideration. We must have before us the precise record—no more and no less—considered by the trial court. The court may consider, of course, those matters which it may notice judicially.

*American Universal Ins. Co. v. Ranson*, 59 Wn.2d 811, 815–16, 370 P.2d 867 (1962). Both this court and the State Supreme Court have followed that rule and have dismissed cases where, as here, the party seeking to reverse the trial court's decision by appeal has failed to provide the appellate court with the precise record considered by the trial court.[1]

Nothing in the record before us informs us what matters the trial court considered in granting the summary judgment. The "facts" on which the majority bases its decision, other than the affidavits it quotes, consist of statements in

---

[1] *Harris v. Kuhn*, 80 Wn.2d 630, 631, 497 P.2d 164 (1972); *Clark v. Tacoma Housing Authority*, 11 Wn. App. 518, 519, 523 P.2d 1200 (1974).

the briefs of counsel. The numerous depositions of the parties and witnesses are not a part of the record before us. Missing, too, are the exhibits, such as the dentist's records, the patient's hospital records and even the critically important medical questionnaire completed by the patient just prior to the events here in question. For this reason, the appeal should be dismissed or, at the very least, the case should be remanded to the trial court with directions to certify the entire record which was presented to the trial court to this court for review.[2]

## GROUND 2

Going past that procedural ground to the merits, however, as the majority has done, based on what facts can be ascertained from such record as we do have before us, I would still reach the same end result and would affirm the trial court's dismissal of the case.

Here we have a situation where, prior to pulling a tooth, the dentist gave his patient a standard injection of a common local anesthetic for the purpose of deadening the nerve in the tooth. The local anesthetic used was xylocaine with epinephrine, a drug with a low incidence of side effects. The dentist did this only after the patient had filled out a medical questionnaire indicating that he was in good health and after the patient had also personally told him that he was in good health. Neither the patient nor his regular family physician knew that the patient had high blood pressure and there was no previous history of high blood pressure.[3]

---

[2]RAP 9.10. *Cf. Heilman v. Wentworth,* 18 Wn. App. 751, 754, 571 P.2d 963 (1977).

[3]Plaintiff's attending physician, Robert P. Crabill, M.D., is quoted in one of the briefs filed in the trial court as having been asked and answered at his deposition as follows:

Q You stated that you had not determined what caused the stroke, you said it may have been hypertension, you also said that you have had patients who have had [a] stroke without any hypertension at all. At this point, would you be speculating as to what caused the stroke?

A I would. I don't know what caused it.

As the patient admitted in response to written interrogatories, he had previously had local anesthesia of one kind or another for dental work and suffered no ill effects from it.

In the briefs and argument before this court, the patient's counsel relied heavily on the 1974 decision of the State Supreme Court in *Helling v. Carey,* 83 Wn.2d 514, 519 P.2d 981, 67 A.L.R.3d 175 (1974). As the patient notes in his brief, the issue in *Helling* "was identical in form to the issue here, . . ." Brief of appellant at 18. It is true that in that case the court disregarded testimony of the parties' medical experts that medical standards did not require routine eye pressure tests for glaucoma upon patients under 40 years of age. The court in that case then went on to hold that as a matter of law a doctor's failure to administer an eye pressure test to patients under 40 years of age constituted negligence. As I read the majority opinion in the present case, it comes very close to holding that a dentist's failure to give a blood pressure test to a patient before administering a local anesthetic constitutes negligence, as was the *Helling* approach. The reason we cannot so hold here, of course, is that after the 1974 *Helling* decision, the state legislature in 1975 promptly enacted a statute abolishing the *Helling* rule and requiring that a departure from the standard of a profession must be shown in order to sustain recovery for malpractice.[4]

At the present time, by statute, in a malpractice case,

the plaintiff in order to prevail shall be required to prove by a preponderance of the evidence that the defendant or defendants failed to exercise that degree of skill, care and learning possessed by other persons in the same profession and that as a proximate result of such failure the plaintiff suffered damages, but in no event shall the provisions of this section apply to an action based on the failure to obtain the informed consent of a patient.

---

[4]RCW 4.24.290, Laws of 1975, 1st Ex. Sess., ch. 35, § 1, p. 252; *Meeks v. Marx,* 15 Wn. App. 571, 577, 550 P.2d 1158 (1976); *Gates v. Jensen,* 20 Wn. App. 81, 84–85, 579 P.2d 374 (1978).

RCW 4.24.290 (part). It was thus the plaintiff patient's obligation to establish the standard of professional practice at the time of the injury and a violation of that standard through the testimony of professional equals of the defendant dentist.[5] According to the briefs in this case, several dentists testified by deposition that at the time of the tooth extraction in question, it was not customary for oral surgeons to take a patient's blood pressure before injecting xylocaine with epinephrine. Therefore, for a dentist to not take a patient's blood pressure in that situation breached no standard of care of the dental profession. I find no contrary professional testimony in the record we have.

The majority, however, reads one of the affidavits before us (that of Dr. Moline) as stating that the defendant dentist "had a definitive duty to determine whether the patient had hypertension or high blood pressure and his failure to do this was not consistent with the accepted standard of care among the dental profession in western Washington in 1972." The majority opinion bases that determination on the portion of that affidavit which reads as follows:

> THAT, he has reviewed Dr. Atkins's record of the procedure and the questionnaire Mr. LeBeuf was asked to fill out.
>
> THAT, it is his opinion that the pre–anesthetic history obtained by Dr. Atkins was not adequate *in that* he omitted to determine whether the patient had hypertension or high blood pressure and the failure to do this was not consistent with the accepted standard of care among the dental profession in western Washington in 1972.

(Italics mine.) I do not read that affidavit as saying what the majority holds that it says. As explained in *Frace v. Long Beach City High School Dist.,* 58 Cal. App. 2d 566, 137 P.2d 60, 62 (1943), the phrase "in that" (which I have italicized in the above quotation) means "because, for the

---

[5]*Shoberg v. Kelly,* 1 Wn. App. 673, 677, 463 P.2d 280 (1969); *Swanson v. Brigham,* 18 Wn. App. 647, 651, 571 P.2d 217 (1977).

reason that . . ."[6] So read, what the dentist's affidavit says is that the history was inadequate, and the further explanation following the term "in that" gives the reason why the history was in his opinion inadequate. In dismissing this lawsuit against the dentist, the trial court in its oral decision said:

> what we end up with here, after some delays to give the plaintiff further opportunity, is a conclusion by a doctor that the history wasn't adequate but a record which shows that had an adequate history been taken it wouldn't have changed the picture, the history would have been that he had no high blood pressure.

I agree. The causal connection between the dentist's claimed negligence and the patient's present physical problems, required by statute to be shown, was not shown; therefore, the patient's malpractice claim was properly dismissed.[7]

What the majority appears to me to be holding here is that a dentist has an affirmative duty to diagnose high blood pressure in a patient, which condition is unknown to the patient, before deadening the nerve in a patient's tooth. No judicial decision has ever held that and I would not do so. Furthermore, hypertension or high blood pressure is a medical condition and dentists are not physicians.

As to the patient's claim of negligent post–surgical care, the testimony noted in the briefs is also in conflict. What is determinative to my view, however, is that again there is no expert testimony of any kind that the dentist's conduct in this regard breached any standard of care of the dental profession. That is not something which can be inferred from lay testimony on the subject, as the majority opinion

---

[6]*See also Local 204, Textile Workers v. Richardson*, 245 Ala. 37, 15 So. 2d 578, 580 (1943).

[7]RCW 4.24.290; *Versteeg v. Mowery*, 72 Wn.2d 754, 755, 435 P.2d 540 (1967).

seems to do.[8] In my opinion that claim, too, was properly dismissed by the trial court.[9]

## GROUND 3

Neither did the patient make out a case under the informed consent (or uninformed consent) doctrine.

A dentist's duty to advise his or her patient concerning perils of treatment and alternative treatments available presupposes that the dentist knew or should have known about the patient's physical infirmity which makes the treatment perilous.[10] If the rule is to be otherwise then a dentist or doctor will have to give every patient a virtually unlimited number of "ifs" before ever administering to the patient. Here the patient assured the dentist that he was in good health and neither the patient nor the dentist was aware that the patient had high blood pressure, as is now theorized by one doctor. The dentist was thus unaware of any material risk to the patient by administering the local anesthetic; therefore, the dentist did not have any duty to inform.[11]

It is a universal principle of law that in any case involving a claim of professional malpractice, an unfortunate result is not in and of itself evidence of negligence.[12] That is as true in this case as in any other.

---

[8]*Shoberg v. Kelly,* 1 Wn. App. 673, 677, 463 P.2d 280 (1969); *Swanson v. Brigham,* 18 Wn. App. 647, 651, 571 P.2d 217 (1977).

[9]RCW 4.24.290.

[10]*Miller v. Kennedy,* 11 Wn. App. 272, 282, 522 P.2d 852 (1974), *aff'd,* 85 Wn.2d 151, 530 P.2d 334 (1975); *Archer v. Galbraith,* 18 Wn. App. 369, 377, 567 P.2d 1155 (1977).

[11]*See Miller v. Kennedy,* 11 Wn. App. 272, 289, 522 P.2d 852 (1974), *aff'd,* 85 Wn.2d 151, 530 P.2d 334 (1975); *Holt v. Nelson,* 11 Wn. App. 230, 235, 523 P.2d 211, 69 A.L.R.3d 1235 (1974).

[12]*Teig v. St. John's Hosp.,* 63 Wn.2d 369, 375, 387 P.2d 527 (1963); *Miller v. Kennedy,* 11 Wn. App. 272, 279, 522 P.2d 852 (1974), *aff'd,* 85 Wn.2d 151, 530 P.2d 334 (1975).

To then put this case into perspective as I see it. The law applicable to this case is no different than the law applicable to any other malpractice case. If a dentist had testified that under the circumstances presented, the failure of the dentist to take the patient's blood pressure violated the standards of dental practice then existent, then the patient would have made out a malpractice case requiring jury determination. The same would also be true if there was such testimony that the post–surgical standard of dental practice was violated by the dentist. Similarly, if the dentist had presented any testimony or other evidence that the dentist failed to advise of any material risk to the patient that was known, then a legally submissible cause under the informed consent doctrine would exist. None of these was present in this case. Nor was any evidence presented to make out a case under any of the numerous other legal theories mentioned, but not argued on this appeal and therefore not before us.[13]

In my view, when the trial court dismissed the case against the dentist, it acted properly and in accordance with the established law of this state. I therefore dissent from the majority opinion.

Reconsideration denied June 26, 1979.

Appealed to Supreme Court July 31, 1979.

---

[13]*DeHeer v. Seattle Post–Intelligencer,* 60 Wn.2d 122, 126, 372 P.2d 193 (1962); *Krause v. McIntosh,* 17 Wn. App. 297, 304, 562 P.2d 662 (1977).