Joseph Life, J.
This motion by Austin Potenza (the only remaining defendant) to set aside the jury verdict of damages awarded to the plaintiff' is granted. A new trial is directed on the issue of whether said defendant proceeded without obtain.ing an informed consent and, should that question be resolved against him, what, if any damages were sustained by plaintiff.
This is an action in medical malpractice in which the thrust of plaintiff’s claim was two-pronged. He charged malpractice in the care and attention which was given to him by the defendant and also the absence of an informed consent in that he w;as insufficiently advised on all the risks attending the procedures which the defendant recommended.
The issues arose out of the following facts:
On July o, 1968 the plaintiff, then approximately 21 years of age, was attending classes at a technical institute.' He had sought outside employment to assist him through his education and on that date was employed at night in a baking company. In the early hours of the morning the blade of a dough mixing machine severely injured his right index finger. Plaintiff’s left hand is his “ dominant ” hand. The fractured bone was set and the lacerations sutured by a physician at a local hospital. That doctor was named as a defendant but at the close of the plaintiff’s case the action against him was withdrawn.
After a time the finger healed flexed at a 90 degree angle at the first phalange but the bone had failed to unite. The workmen’s compensation insurance carrier referred plaintiff to the defendant for evaluation of the usefulness of the hand. Defendant who is a board-certified orthopedist and specializes in hand *53 surgery testified that when he saw the plaintiff the value of the hand had been reduced by some .40%. The uncontradicted testimony of the defendant was that a hand is rated as follows: 40% for the thumb, 20% for each of the index and third fingers and 10% each for the fourth and fifth fingers. Further he said that the index finger as it was flexed, interfered with the remaining fingers to the extent of at least 20% .so that by itself and as an impediment to the others there was a total loss, of 40%.
Plaintiff asked defendant to take over the management of his case and at defendant’s request plaintiff sought and obtained the consents of his first treating physican and the compensation carrier.
Defendant advised two operations. First a bone graft and then a second procedure to relieve the contractions of the tissues of the finger so that it could be extended and mobility restored. Plaintiff wanted both done at one time but defendant refused saying that was too much .surgery and insisted that the corrections would ¡have to be done in two stages.
Plaintiff’s claim is that the defendant did not advise him of the risks which attended the operations and the possible loss of that finger.
In November, 1968 the defendant undertook and successfully completed the first operation. The bone graft was made by taking a piece of bony tissue from the ulna and the finger healed but remained flexed as we have described.
In February of 1969 the second operation was undertaken and proceeded satisfactorily until its conclusion when it was observed that blood circulation had not returned to the finger. Measures undertaken to restore circulation proved unsuccessful.
The surgery performed by the defendant had been done on the dorsal side of the finger. To determine the cause of the untoward event and to correct it if possible, defendant proceeded to operate on the palmar side of the finger and then discovered a thrombus at the base of one side of the finger which had existed for some time and which was of a permanent nature. When all efforts proved futile and it became apparent that circulation was permanently impaired, defendant awaited a line of demarcation so that he could determine where an amputation had to be made to arrest the spread of gangrene. When that appeared ■the finger was amputated at its base.
The uncontradicted evidence was that with the finger amputated the plaintiff had an 80% functional use of the hand whereas with the finger in its flexed position it was less.
*54 At the conclusion of the trial the court submitted to the jury four possible verdicts as follows: (1) for the defendant on all issues; (2) for the plaintiff on malpractice; (3) for the plaintiff on lack of informed consent; and (4) for the plaintiff on both of the last two.
The jury was .given written questions with instructions that they were not to be answered if the verdict were for the defendant on all of the issues but in the event it were for the plaintiff they could say whether it was on malpractice, lack of informed consent or both and in any event were to report whether the verdict was unanimous or by five-sixths of their number. The jury found for the defendant on malpractice but for the plaintiff on the issue of lack of informed consent. In both instances the verdict was unanimous.
On the issue of malpractice the verdict was amply .supported by the record. It follows that the defendant’s conduct was in accordance with sound medical practice and when he was confronted with the unfortunate accident there was no choice but to remove the finger to avoid even more serious consequences. The question arises as to whether plaintiff suffered any damages even though there may have been a lack of informed consent.
In .support of this application defendant argues first, that expert testimony is necessary to prove that there was a departure from generally accepted medical .standards :by the failure to inform and, second that the court failed to instruct the jury that they were to determine whether a reasonably prudent person would have consented to the operation after all the attendant risks were revealed.
In 1914 Mr. Justice Cardozo in Schloendorff v. New York Hosp. (211 N. Y. 125) stated that (pp. 129-130) “ [e]very human being of adult years and sound mind has .a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient’s consent, commits. an assault, for which he is liable in damages.” This rule continues to be relevant today not only where surgery is done without consent but is ‘ ‘ equally applicable to a .situation where one has been given insufficient information upon .which to formulate an intelligent consent. An uninformed or invalid consent is tantamount to no consent at all (cf. Birnbaum v. Siegler, 273 App. Div. 817).” (Darrah v. Kite, 32 A D 2d 208, 210-211.) Because the doctrine relating to failure to inform “is an offshoot of the law of assault and battery” (Fogal v. Genesee Hosp., 41 A D 2d 468, 473) the issue of consent should properly be determined ¡by the trier of the facts because the duty to dis *55 close “must be measured by the patient’s need, and that need •is the information material to the decision.” (Canterbury v. Spence, 464 F. 2d 772, 786, cert. den. 409 U. S. 1064.) Standards established by the medical profession should not control.
Although there are two schools of thought on this topic (see the discussion on “Informed Consent — Expert Testimony” in 52 ALR 3d 1084) in this court’s view the rule enunciated in Fogal v. Genesee Hosp. (supra, p. 473) (which follows the Canterbury rule) should be the test to be applied in such cases and that is “ a doctor is obliged to divulge to his patient the risks which singly or in combination, tested by general considerations of reasonable disclosure under all the circumstances, will materially affect the patient’s decision whether to proceed with the treatment.” Support for this position is found in Cobbs v. Grant (8 Cal. 3d 229) where the Supreme ¡Court of California presented the opposing views and held that (pp. 243, 245) “ [u]nlimited discretion in the physician is irreconcilable with the basic right of the patient to make the ultimate informed decision * * * In sum, the patient’s right of self-decision is the measure of the physician’s duty to reveal.” In 25 Syracuse Law Review at pages 452-453 Professors Robert J. Tymann and William Samore of the Albany Law School commenting upon the Fogal ruling found themselves in agreement with it since it (p. 453) “ appears totally just, recognizing the patient’s right to determine what will be done to his own body, and not allowing his rights to rest on the existence of relevant professional standards.” Because this court in its charge applied the Canterbury and Fogal rule that argument by the defendant in support of the application to set aside the jury’s decision on lack of informed consent is rejected.
In order for the jury to find for plaintiff they would have to determine that a reasonably prudent person after being fully informed would not have consented to the operation. What plaintiff would have done had he been informed “ would not be conclusive evidence one way or the other ’’ since the question is not, what the plaintiff would ‘ ‘ have decided, but what would a reasonably prudent person in ” plaintiff’s “ circumstances, having sufficient knowledge of the material risks incident to the procedure, have decided” (Fogal v. Genesee Hosp., supra, p. 474). The “ objective test is preferable: i.e., what would a prudent person in the patient’s position have decided if adequately informed of all significant perils. (Canterbury v. Spence, supra, 464 F. 2d 772, 787).” (Cobbs v. Grant, supra, p. 245; see 64 Nw. U. L. Rev. 628, article by Professor Jon R. Waltz *56 and Thomas W. Scheuneman, on ‘ ‘ Informed Consent to Therapy ”, p. 647.) To rely upon a subjective test would place “ the physician in jeopardy of the patient’s hindsight and bitterness.” (Canterbury v. Spence, supra, pp. 790-791) and the interest of justice would not be served by such an irrational process.
In a very interesting commentary ‘ ‘ Informed Consent in Medical Malpractice Cases ’ ’, 14 FTD (Bulletin of The Defense Research Institute, Inc.) September 1973, Merton E. Marks, Esq., citing authorities remarks that in order to make the informed consent meaningful the information which the doctor discloses must be measured by “ the patient’s intellectual capacity ’ ’ and in the course of his discussion Mr. Marks directs attention to reports in other jurisdictions (Corn v. French, 71 Nev. 297; Wilkinson v. Vesey, 110 R. I. 606; Hunter v. Brown, 81 Wash. 2d 465) where it was held that what the doctor must disclose should be a jury question and not one calling for medical expertise. In the Wilkinson case the court said that what the patient needs td know (p. 625) “is a human judgment ” whjch does not require testimony of the medical profession. The court went on to explain that what is reasonable for one patient may not be for another and what some doctors may tell their patients does not establish a criterion for what the doctor should tell his patient in the (p. 6-25) “ one-on-one ” relationship.
The court finds that the defendant’s rights were prejudiced and that a new trial should be held since the jury was not instructed to determine what a prudent person in plaintiff’s position should have decided after being adequately informed of all the perils. Accordiiigly, defendant’s motion is granted and the jury’s verdict on the question of lack of informed consent is set aside and a new trial on that issue is ordered.
The court has not overlooked the issue of whether plaintiff proved any damages. However, because of the prior determination there is no necessity to rule on that aspect of defendant’s motion. Plaintiff is advised, however, that at the new trial he should be prepared to demonstrate those “ damages which flow from the unauthorized procedure"” (Darrah v. Kite, supra, p. 211) because there “must be a causal relationship between the physician’s failure to adequately divulge 'and damage to the patient.” (Canterbury v. Spence, supra, p. 790.)
This case has many parallels with Garzione v. Vassar Bros. Hosp. (36 A D 2d 390, affd. 30 N Y 2d 857) and if the rule in Garzione could be applied in full we would set aside the verdict here and fix plaintiff’s damages at $1. However, there are *57 differences 'between the two cases. In Garzione the plaintiff had suffered severe injuries and although surgery had been done, healing had not taken place and further surgery was necessary and it was in the course of the indicated treatment that it became apparent that an amputation was unavoidable. Here the question arises whether plaintiff would ever have undertaken any treatment and would have preferred to live with the deformed finger had he ¡known the risk- of losing it entirely.
Any motions -on which the court may have reserved decision during the course of the trial and which are inconsistent with this determination are denied.