[No. 3882–1.   Division One.   August 15, 1977.]

ROBERT F. ARCHER, ET AL, *Appellants,* v. CHARLES
GALBRAITH, ET AL, *Respondents.*

*Rush & Hayes* and *William J. Rush,* for appellants.

*Davies, Pearson, Anderson, Seinfeld, Gadbow, Hayes & Johnson, P.S.,* and *Wayne J. Davies,* for respondents.

CALLOW, J.—In the spring of 1971, the plaintiff Ruth T. Archer discovered a small lump on her neck and made an appointment with Herman Judd, M.D., for an examination. She was then 41 years of age. Dr. Judd had laboratory tests performed, one of which showed that the thyroid gland was releasing the correct amount of thyroid into the bloodstream, but another test showed that the left lobe of the thyroid was not assimilating iodine properly. Dr. Judd diagnosed the lump as a "cold" nodule or tumor which has a proclivity to become cancerous, and he referred the plaintiff to the defendant, Dr. Charles Galbraith, a surgeon.

On May 27, 1971, the defendant performed a hemithyroidectomy, removing the left lobe of the plaintiff's thyroid gland. Subsequent reports from the pathologist showed that the tumor was a benign adenoma. The plaintiff never regained full use of her voice after the surgery. Her vocal

communication was reduced to a hoarse whisper, and occasionally she cannot speak. She has difficulty breathing after any exertion, difficulty swallowing liquids, and she has experienced a number of other difficulties and embarrassments because of her impairment. The cause of her impairment was diagnosed as injury to a laryngeal nerve, damaged at the time of the surgery.

Mrs. Archer testified to information and advice given to her by Dr. Galbraith prior to the surgery. She stated that the defendant told her little of the risks of the surgery and did not inform her of possible alternative courses of treatment. She said that had she been advised that alternative courses of treatment were available, she would not have consented to the surgery. She said that in her discussion with the defendant as to whether to have the surgery he said, "I understand that Dr. Judd feels it should be removed. What do you think?" She replied, "You are the doctor," and he said, "I feel it should be removed." The plaintiff stated that when she told Dr. Galbraith that "he was the doctor" she meant for him to use his best judgment and that if he recommended surgery, she would have surgery. She stated that she signed an informed consent and request for operation form when she entered the hospital, not knowing that she had a choice in the matter.[1]

The defendant doctor testified that the only acceptable treatment was surgery; that no one would leave that tumor in her neck; that there is no way to tell if the tumor was malignant without surgery, except by needle biopsy, which is inaccurate and dangerous. He also testified that in thyroid surgery there were risks that the patient would die from the anesthesia or from blood loss; that the patient would become paralyzed as a result of the operation; that the patient would lose his voice as a result of the surgery; that the patient would experience a deficiency of thyroid

---

[1]The form requests the physician to perform a "Left hemithyroidectomy with excision of nodule." There is no reference in the form to information imparted to the patient relative to treatment, alternatives, or attendant risks.

productive ability, and that the patient would experience muscle problems as a result of the surgery.

Dr. Galbraith testified that he advised Mrs. Archer as follows in regard to the risks of the surgery:

I advised her the same way I advise anybody that I am going to do a thyroidectomy on, and my basic procedure is to tell them that this is an operation which I consider to be a major operation, but a safe operation; that the chances of them dying from this operation are extremely remote; that because of the area where the operation is done, there are certain risks involved and that one of these may be, they may end up being hoarse if the nerve that supplies the vocal cord is damaged, but the chances of this happening are extremely unlikely. I also mentioned the fact that there are glands in that area that if they were totally removed could affect their muscle metabolism. I usually don't mention any of the other possibilities of bleeding to death and having infections. These are possibilities, but I usually, as a matter of policy, don't mention them.

Another physician, after being asked about possible alternatives, testified in part as follows:

A  Okay. And with someone of Mrs. Archer's type I would sit there and I'd say: "Well, you have a nodule in that thyroid gland. We do not know what it is. The scan has just been described and shows that this is cold or hot, and this is presumably a cold nodule. This cold nodule may represent a adenoma and be perfectly benign, it may represent a tumor and be malignant. Now, I can't tell you what it is. I can give you some idea from our examination of what I think it is, but this is just an educated guess." And I say: "Now, you will have some choices and decisions to make on what needs to be done. This can be left alone, you don't have to do anything about it. It's your choice whether you want surgery or don't want surgery." We might recommend surgery for you. This can be removed.

Then, you have another alternative in which you can say this can be kept under observation for a period of time, and dependent upon the individual that has referred the individual to the surgeon would depend upon what you might do in this respect,

internist, general practitioner would make some difference, whether they were acquainted with thyroid disease or whether they were not.

So, you have the choice of leaving it alone, you have the choice of removing it, you have a choice of keeping it under observation for a period of time.

Q   What would that show, if you kept it under observation for a period of time?

A   Well, it would show you whether it changes in size or not. It might regress under the possibility of suppressive therapy by giving them thyroid itself. If they were new thyroid to begin with, . . . if they had a normal thyroid, so if you gave them thyroid it may suppress some of these things. Medical people like to use these things, surgeons don't like to use these things. Surgeons are cutter–uppers and they operate, and they recommend, usually, the operative procedure.

So, you have two things that you can recommend to the patient. You can keep it under observation or you can have it taken out, and there are certain things that indicate whether you should take it out or whether you should not take it out. The younger the patient the more likely you are to take it out. The older the patient the more likely you are to consider the possibility of observation for a period of time.

This physician also testified that in all thyroid surgery there are risks that the recurrent laryngeal nerve will be injured, that a patient might be injured in various ways by the administration of anesthesia, that pneumonia is a risk, that bleeding might be difficult to control, and that infection might occur.

Dr. Judd testified that this was a cold nodule, that 5 to 25 percent of such nodules were cancerous, that surgery was absolutely necessary, and that no other method was successful. He was asked and testified further in part as follows:

Q   And how do you treat these, say, that are non–cancerous? Are there ways of treating these nodules, other than surgery?

A   No, not successfully. There are methods that you could do for someone who refused to have the gland

removed. The administration, sometimes, of thyroid hormone will help, at least temporarily. One can use radioactive iodine in some of them and also, radiation therapy in some, but to do that would scare me.

Another physician testified that the preferred method of treatment of a cold nodule of the thyroid gland is surgery. He stated that the only methods for determining whether or not cancer is present are surgery or a needle biopsy, and that a needle biopsy is dangerous because it opens the road for the spread of cancer into a fertile field; that the results of treating with thyroid medication in nodules similar to the patient's is disappointing; that needle biopsies may not get tissue from the nodule or the specimen may be so small that the pathologist is uncertain, and surgery is therefore preferred. He testified that the risks in thyroid surgery are that the patient will suffer injury or damage from the anesthesia, from bleeding, from damage to the recurrent laryngeal nerve, and from heart attack as a result of the surgical trauma.

The plaintiff alleged that the defendant failed to properly diagnose and treat the condition for which she sought advice; that he failed to properly care for and advise her regarding alternative courses of treatment; and that he failed to obtain her consent to perform the operation in the manner in which it was accomplished. The defendant denied liability, and following trial the jury returned a verdict for the defendant.

The issue presented is whether the evidence admitted was sufficient to require the giving of an instruction to the jury to the effect that a physician has a duty to inform a patient about available alternative courses of treatment and the risks involved therein prior to obtaining the patient's consent to surgery.

The trial court instructed the jury as follows:

You are instructed that plaintiffs' claim against the defendant based upon failure to advise of or use an alternative method of treatment is withdrawn from your consideration, and you are not to consider this claim in

any way in your determination of the issues in this matter.

Instruction No. 11.

A physician has a legal duty to inform his patients about the material facts, to include the nature and probable results of any proposed course of treatment, in order to enable the patient to weigh and balance the anticipated benefits from the proposed course of treatment and the probable result that course of treatment will result in. The patient is entitled to have this information so that she can determine whether or not to consent to the treatment.

A fact, or risk, or probable result is material when it may be said that a reasonable person in the patient's position probably would attach significance to it in deciding whether or not to submit to the treatment.

Failure to perform the duty to inform by the physician is negligence, even though the particular therapy or treatment might be administered and performed with that degree of skill otherwise required.

Instruction No. 14. The plaintiff asserts it was error to give those instructions and to fail to give the following proposed instruction:

A physician has a legal duty to inform his patients about the material facts, to include the nature and probable results of any proposed course of treatment or alternative courses of treatment reasonably available, in order to enable the patient to weigh and balance the anticipated benefits from the proposed course of treatment or the alternative courses of treatment and the probable results that each course of treatment that will result in. The patient is entitled to have this information so that she can determine which course of treatment to follow and whether or not to consent to a proposed course of treatment.

A fact, or risk, or probable result is material when it may be said that a reasonable person in the patient's position probably would attach significance to it in deciding whether or not to submit to the treatment.

Failure to perform the duty to inform by the physician is negligence, even though the particular therapy or treatment might be administered and performed with that degree of skill otherwise required.

The plaintiff's proposed instruction contains the words "or alternative courses of treatment reasonably available," and "or the alternative courses of treatment," which do not appear in the instruction given.

The record contains evidence from which a jury could conclude that the patient was not informed fully on the material risks of surgery. There is evidence from which a jury could conclude that the patient was not informed fully of the possibility of observing a thyroid nodule for a time to see whether it would increase in size or regress under medication. The record contains evidence from which a jury could conclude that an alternative course of treatment could have been followed, that there were risks of following this alternative, and that the plaintiff was not informed concerning the risks of undertaking alternative treatment.

We stated in *Holt v. Nelson,* 11 Wn. App. 230, 235, 523 P.2d 211, 69 A.L.R.3d 1235 (1974), that for a patient to establish a case of physician negligence in failing to impart information so treatment could be chosen intelligently, the patient must prove that (1) the doctor failed to inform the patient of alternative treatments, the reasonably foreseeable material risks of each alternative, and of no treatment at all; (2) the patient would have chosen no treatment or a different course of treatment had the alternatives and the material risks of each been made known; and (3) the patient was injured as a result of submitting to the treatment.

The trier of fact is to determine from the evidence as a whole whether a reasonably prudent person would have chosen a different treatment than that received, and, for the issue to be submitted, the evidence need only be such that the jury could infer that the choice made by a person in the patient's position would have been different. *Holt v. Nelson, supra. See also Cobbs v. Grant,* 8 Cal. 3d 229, 502 P.2d 1, 104 Cal. Rptr. 505 (1972); *Downer v. Veilleux,* 322 A.2d 82, 91 (Me. 1974); *Barnette v. Potenza,* 79 Misc. 2d 51, 359 N.Y.S.2d 432 (1974).

The theory of informed consent is based upon the patient's right to know. *Young v. Group Health Coop.* 85 Wn.2d 332, 534 P.2d 1349 (1975). It was said in *Miller v. Kennedy,* 11 Wn. App. 272, 282–83, 522 P.2d 852 (1974), *aff'd,* 85 Wn.2d 151, 530 P.2d 334 (1975):

> The scope of the duty to disclose information concerning the treatment proposed, other treatments and the risks of each course of action and of no treatment at all is measured by the patient's need to know. The inquiry as to each item of information which the doctor knows or should know about the patient's physical condition is "Would the patient as a human being consider this item in choosing his or her course of treatment?"

(Footnotes omitted.)

The plaintiff has the burden of proving that the physician failed to inform the patient of the available courses of treatment or failed to warn of the consequential hazards of each course of treatment. Here, there was medical testimony which indicated that an alternative course of treatment was available and that the patient was not informed of it.[2] *Miller v. Kennedy, supra* at 284, stated:

---

[2]*Congrove v. Holmes,* 37 Ohio Misc. 95, 308 N.E.2d 765 (1973), involved damages to the vocal cords resulting from a thyroidectomy. Commenting upon the landmark case of *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972), the opinion in *Congrove v. Holmes* stated:

> The court reasoned that the informed consent doctrine is based on the proposition that every competent person is the final arbiter of whether or not he gets cut, by whom he gets cut, and where he gets cut. A patient has the sovereign choice of whether he will submit to surgery in the course of the diagnosis and treatment, and in order to make this choice meaningful and realistic the doctor is under a legal duty to disclose to a patient any serious risks involved in the contemplated surgery, and the alternatives available to him, including the risks from declining surgery.

> The doctrine of informed consent does not depend on expert medical testimony and the patient is not required to produce medical evidence that there is a local standardized professional practice to make the disclosure in question, such as danger of voice loss from a thyroidectomy. In other words, the court stated that the basis of liability, based upon lack of informed consent, makes it unnecessary for the patient to produce expert testimony of the doctor's negligence in the surgery or other treatment. The duty to disclose serious risks

Those elements which are the province of the medical profession must be established by the testimony of medical experts in the field of inquiry. Thus, the existence of the risks and alternatives which were present in the particular physical condition would be beyond the knowledge of the layman and would have to be established by medical testimony.

It is argued that the evidence presented by the physician who testified that medical treatment and observation was a possible alternative course was phrased only in terms of what he, as an individual, might do rather than establishing that course of treatment as accepted by the medical profession. We do not read that testimony in so narrow a fashion. The doctor testifying about possible alternatives set forth a means of therapy pursued by a respectable segment of the medical profession. The patient was entitled to be told about that alternative. The testimony was not a recitation on a course of treatment followed only by the medical witness himself.

While it may be that the testimony as a whole indicated that the prudent course of action was to remove the nodule surgically, this decision was not a decision to be made by the physician but by the patient. The totality of the evidence permits an inference that had the patient been informed of the alternative treatment, though risky, a reasonably prudent patient would have chosen that course. *See ZeBarth v. Swedish·Hosp. Medical Center,* 81 Wn.2d 12, 31, 499 P.2d 1, 52 A.L.R.3d 1067 (1972). A jury question was presented on that issue. *Holt v. Nelson, supra. See also Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676, 69 A.L.R.3d 1202 (1972). As said in *Miller v. Kennedy, supra* at 286:

[I]t is not for the medical profession to establish a criteria for the dissemination of information to the patient based upon what doctors feel the patient should be told. . . . The patient has a right to know and the doctor

should not be based upon the doctor's practices but upon the patient's need for full disclosure of serious risks and the feasibility of alternatives in order for the patient to make an intelligent and informed choice.

*Congrove v. Holmes, supra* at 104–05.

has the duty to inform the patient whether the doctor wants to or not. The fiduciary duty of the doctor requires disclosure. There is no room for paternalism or for overprotectiveness.

Where, as here, there is medical evidence of a possible alternative course of treatment, the jury must be instructed that the physician has a duty to inform the patient of that alternative and of the material risks of pursuing that course of treatment, of each choice of treatment and of no treatment at all. The concept of choice presupposes that alternatives exist, and where there is evidence of the existence of an available alternative course of treatment, it is for the jury to decide whether the alternative was feasible, whether the physician told the patient about the possible benefits and dangers of pursuing the alternative course, whether a reasonably prudent patient would have chosen the different course of treatment had the alternative been disclosed, and whether the failure to disclose caused injury. *Miller v. Kennedy, supra* at 283. *See also Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972); *Cobbs v. Grant, supra; Getchell v. Mansfield,* 260 Ore. 174, 489 P.2d 953 (1971).

The removal of the consideration of whether or not the doctor informed the patient of an alternative course of treatment from the jury, was error. The judgment is reversed and the cause is remanded for a new trial.

SWANSON and ANDERSEN, JJ., concur.

Petition for rehearing denied December 27, 1977.

Review denied by Supreme Court June 16, 1978.