**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| MARI YVONNE DAVIES, | No. 80854-1-I |
| Appellant, | |
| v. | DIVISION ONE |
| MULTICARE HEALTH SYSTEM, a Washington corporation d/b/a GOOD SAMARITAN HOSPITAL, and MT. RAINIER EMERGENCY PHYSICIANS, PLLC; MICHAEL HIRSIG, M.D., | PUBLISHED OPINION |
| Respondents. | |

MANN, C.J. — In this medical malpractice action, Mari Davies appeals the trial

court's order dismissing her informed consent claim on summary judgment. Davies also

appeals the judgment entered on a jury verdict finding the defendants not negligent.

Davies argues that the trial court erred by giving an exercise of judgment jury

instruction, and preventing her expert neurosurgeon from testifying at trial regarding the

standard of care for an emergency room physician. We reverse summary judgment

dismissal of Davies's informed consent claim and remand for trial. We otherwise affirm.

FACTS

On August 23, 2017, Davies was involved in a single-car rollover crash. She had

no memory of the accident. Paramedics extracted Davies from the vehicle, placed her

on a backboard and in a cervical collar, and transported her by ambulance to Good Samaritan Hospital in Puyallup.  Davies reported pain in her neck, back, left shoulder, and tingling in her left arm.  She also had preexisting high blood pressure, pneumonia, kidney stones, and diabetes.

Dr. Michael Hirsig, the attending physician at the Good Samaritan emergency room, saw Davies upon arrival.  Dr. Hirsig conducted a physical exam and ordered laboratory tests, an electrocardiogram (EKG), and computerized tomography (CT) scans of her head, cervical spine, abdomen, and pelvis.  Dr. Scott Henneman, the radiologist who interpreted the CT scans, noted fractures of Davies's cervical spine at the C3 level.  At Dr. Henneman's recommendation, Dr. Hirsig contacted Dr. William Morris, a neurosurgeon who often consults by telephone with other physicians in the MultiCare Health System.  After reviewing the images, Dr. Morris told Dr. Hirsig that the fractures appeared stable and did not require surgery.  Neither Dr. Henneman nor Dr. Morris identified a fracture through the transverse foramen, which would increase the risk of injury to the vertebral artery.  Dr. Morris recommended that Davies be placed in a cervical collar for 8 weeks, with a follow-up CT scan to check for healing and alignment.  Dr. Morris's progress notes indicate that he was under the impression Davies would be transferred to Tacoma General Hospital for observation by the trauma team.

Dr. Hirsig initially informed Davies and her family that she had sustained a neck fracture and would likely be transferred to the trauma unit at Tacoma General Hospital.  However, after the consultation with Dr. Morris, Dr. Hirsig advised that Davies did not need hospitalization or surgery and could be discharged with a hard cervical collar, with follow-up on an outpatient basis.  Dr. Hirsig testified that he asked the family whether

2

they were comfortable taking her home, and they said yes.[1]  Dr. Hirsig prescribed pain medication, nausea medication, a muscle relaxant, and a different antibiotic for her pneumonia, and sent Davies home without further treatment or testing.

The following day, Davies's daughter took Davies to her primary care physician, Dr. Andrew Larsen, for a follow up visit.  Davies's vital signs were unstable and she had severe neck pain made worse by coughing.  Dr. Larsen arranged for Davies to be immediately transported to Providence St. Peter hospital for direct admission.  While awaiting transport, Davies suffered a stroke in Dr. Larsen's office.  Her stroke was later determined to have been caused by a vertebral artery dissection sustained when her neck fractured during the accident.  Davies was hospitalized for approximately three weeks and now resides at an assisted living facility.

On May 31, 2018, Davies filed suit against MultiCare alleging (1) medical negligence, (2) failure to obtain informed consent, and (3) corporate negligence. Davies alleged that MultiCare and its employees or agents breached the standard of care by failing to admit or transfer her for observation and treatment or by failing to order additional imaging, such as a CT angiography (CTA) scan, to check for vertebral artery dissection prior to discharge.  Dr. Hirsig was allowed to intervene on September 14, 2018.  On February 13, 2019, Davies filed an amended complaint and added Dr. Hirsig's employer, Mt. Rainier Emergency Physicians PLLC, as a defendant.

On cross-motions for partial summary judgment, the trial court dismissed Davies's informed consent claim, and the case proceeded to trial on the negligence claims.

---

[1] Davies's daughter Melissa Brononske disputed Dr. Hirsig's testimony that the family agreed with the discharge decision.

At trial, the jury heard expert testimony regarding whether Dr. Hirsig breached the standard of care of an emergency medicine physician. Dr. Hirsig testified that he considered and rejected a diagnosis of vertebral artery dissection and that his care of Davies met the standard of care. Dr. Raymond Moreno, an emergency medicine physician who practices in Portland, Oregon, testified that Dr. Hirsig "absolutely met the standard of care" by performing a broad workup exam, identifying Davies's neck fracture, and consulting with Dr. Morris prior to making a disposition decision. Dr. Moreno further testified that the standard of care in Washington and Oregon does not require a CTA scan for every C3 fracture.

Davies's expert Dr. Carrie Tibbles, an emergency physician at Beth Israel Deaconess Medical Center in Boston, testified that her hospital routinely obtains a scan of the vertebral arteries for patients with neck fractures and that when an emergency room physician identifies vertebral artery dissection as a differential diagnosis, the standard of care requires a CTA scan. She further testified that it was not safe for Davies to go home that day.

Davies also sought to call Dr. Clara Harraher, a neurosurgeon who practices in California, to testify that Dr. Morris breached the standard of care for a neurosurgeon and that Dr. Hirsig breached the standard of care for an emergency room physician. At trial, following the defendants' foundational objection, the trial court ruled that Dr. Harraher could testify to a neurosurgeon's standard of care but not an emergency medicine doctor's standard of care.

The jury also heard expert testimony regarding whether Dr. Morris breached the standard of care for a neurosurgeon in his consultation with Dr. Hirsig. Dr. Morris

described his practice of consulting with other MultiCare physicians regarding neurological issues, and testified that he met the standard of care. Neurologists Dr. David Lundin and Dr. Jeffrey Johnson testified that Dr. Morris's consultation met the standard of care and that not all C3 fractures require vascular imaging.

Dr. Harraher testified that Dr. Morris's consultation with Dr. Hirsig did not meet the standard of care for a neurosurgeon. She testified that the standard of care required a CTA in this case given the nature of Davies's injuries and the risk of vertebral artery injury.

Over Davies's objection, the court gave the following "exercise of judgment" jury instruction:

> A physician is not liable for selecting one or two or more alternative diagnoses, if, in arriving at the judgment to make the particular diagnosis, the physician exercised reasonable care and skill within the standard of care the physician was obliged to follow.

The jury returned a special verdict finding Dr. Hirsig and MultiCare not negligent, and therefore did not reach the issues of proximate cause or damages. The trial court entered judgment against Davies. Davies appealed.

## ANALYSIS

A. Informed Consent

Davies first argues that the trial court erred in dismissing her informed consent claim on summary judgment.[2] This court reviews summary judgment orders de novo. Seybold v. Neu, 105 Wn. App. 666, 675, 19 P.3d 1068 (2001). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is

---

[2] In her opening brief, Davies expressly states that her corporate negligence claim against MultiCare and vicarious liability claim against Mt. Rainier were not at issue in this appeal. The claims are therefore abandoned.

entitled to judgment as a matter of law. CR 56(c). All evidence and reasonable inferences are construed in the light most favorable to the nonmoving party. Keck v. Collins, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015).

"Informed consent and medical negligence are distinct claims that apply in different situations. While there is some overlap, they are two different theories of recovery with independent rationales." Anaya Gomez v. Sauerwein, 180 Wn.2d 610, 617, 331 P.3d 19 (2014). "Informed consent allows a patient to recover damages from a physician even though the medical diagnosis or treatment was not negligent." Backlund v. Univ. of Wash., 137 Wn.2d 651, 659, 975 P.2d 950 (1999). To prove failure to obtain informed consent, a plaintiff must show:

> (a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
>
> (b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
>
> (c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
>
> (d) That the treatment in question proximately caused injury to the patient.

RCW 7.70.050(1).

Washington's informed consent statute is "generally based on the policy judgment that patients have the right to make decisions about their own medical treatment." Backlund, 137 Wn.2d at 663. "A necessary corollary to this principle is that the individual be given sufficient information to make an *intelligent* decision." Smith v. Shannon, 100 Wn.2d 26, 29, 666 P.2d 351 (1983). "The concept of patient decisionmaking regarding treatment has sometimes been described as 'patient

sovereignty.'" Backlund, 137 Wn.2d at 663 (quoting Archer v. Galbraith, 18 Wn. App. 369, 377 n.2, 567 P.2d 1155 (1977)). "[I]t is for the patient to evaluate the risks of treatment and that the only role to be played by the physician is to provide the patient with information as to what those risks are." Smith, 100 Wn.2d at 30.

In Gates v. Jensen, 92 Wn.2d 246, 250, 595 P.2d 919 (1979), a case decided prior to the adoption of RCW 7.70.050(1), our Supreme Court addressed whether the doctrine of informed consent requires a physician to inform a patient of a bodily abnormality and diagnostic procedures that were available to determine the significance of the abnormality. In Gates, the plaintiff complained of difficulty in focusing, blurring, and gaps in vision. Gates consulted an ophthalmologist, Dr. Hargiss, who took eye pressure readings that indicated her eye pressure was in the borderline area for glaucoma. Dr. Hargiss did not conduct further tests and informed Gates that he had checked for glaucoma but found everything all right. Dr. Hargiss did not inform Gates that the high pressure put her at risk for glaucoma, nor that he had available two additional simple, inexpensive, and risk free diagnostic tests for glaucoma.[3] Gates, 92 Wn.2d at 247-48.

At trial, Gates requested jury instructions on the doctrine of informed consent, which the trial court denied. The Supreme Court reversed, explaining:

> Important decisions must frequently be made in many non-treatment situations in which medical care is given, including procedures leading to a diagnosis, as in this case. These decisions must all be taken with the full knowledge and participation of the patient. The physician's duty is to tell the patient what he or she needs to know in order to make them. The existence of an abnormal condition in one's body, the presence of a high risk of disease, and the existence of alternative diagnostic procedures to

---

[3] The first was to use standard drops for dilating the pupils to obtain a better view of the optic nerve. The second was to have Gates take a "visual field examination" to determine if she had suffered any loss in vision. Gates, 92 Wn.2d at 248.

conclusively determine the presence or absence of that disease are all facts which a patient must know in order to make an informed decision on the course which future medical care will take.

Gates, 92 Wn.2d at 250-51.

At the other end of the spectrum, our Supreme Court has also held that a claim for misdiagnosis does not support a claim for informed consent where the treating physician is unaware of alternative diagnoses. Backlund, 137 Wn.2d at 661. In Backlund, the defendant physician diagnosed a newborn infant with jaundice and chose to treat the condition with phototherapy rather than a blood transfusion. 137 Wn.2d at 662. The phototherapy treatment was not successful and the infant suffered brain damage and died. The infant's parents brought medical malpractice and informed consent claims against the treating physician and the University of Washington. A jury exonerated the treating physician and University from negligence for continuing to treat with phototherapy rather than a transfusion. Backlund, 137 Wn.2d at 653. The trial court found that the possibility of a transfusion was a "material fact" of which the Backlunds were not aware and thus supported their claim for lack of informed consent. The court concluded, however, that the Backlunds failed to prove that a reasonably prudent person would have consented to the treatment even if informed.

On appeal, the University argued that the Backlunds' claim for lack of informed consent failed as a matter of law because the jury had exonerated the physician from liability for negligence. Our Supreme Court first recognized that negligence and informed consent are "alternative methods of imposing liability on a health care practitioner." And that "[i]nformed consent allows a patient to recover damages from a

8

physician even though the medical diagnosis or treatment was not negligent."

Backlund, 137 Wn.2d at 659.  The court explained further:

> A physician who misdiagnoses the patient's condition, and is therefore
> unaware of an appropriate category of treatments or treatment
> alternatives, may properly be subject to a negligence action where such
> misdiagnosis breaches the standard of care, but may not be subject to an
> action based on failure to secure informed consent.

Backlund, 137 Wn.2d at 661.

The Supreme Court disagreed with the University's position that the Backlunds'

informed consent claim failed as a matter of law.  The court concluded that even though

the jury found no negligence, because there were no facts suggesting that the treating

physician was unaware of the transfusion alternative, the "trier of fact might still have

found he did not sufficiently inform the patient of risks and alternatives in accordance

with RCW 7.70.050."  Backlund, 137 Wn.2d at 662.  The Supreme Court agreed with

the trial court, however, that the Backlunds failed to demonstrate that a reasonably

prudent person would have consented to the treatment even if informed.   Backlund,

137 Wn.2d at 668.

More recently, in Anaya Gomez, our Supreme Court again discussed the

interplay between informed consent claims and negligence claims based on

misdiagnosis.  180 Wn.2d at 613.  In Anaya Gomez, the physician did not alert a

diabetic patient to preliminary blood test results indicating that she had a yeast infection,

having concluded that it was a false positive because the patient indicated that she was

feeling better.  180 Wn.2d at 613-14.  A later test confirmed the presence of a severe

yeast infection.  Anaya Gomez, 180 Wn.2d at 615.  After the patient died, her personal

representative brought claims for negligence and informed consent.  The trial court

dismissed the informed consent claim on summary judgment, and the Supreme Court affirmed.

The Supreme Court began by setting forth the issue before it: "[i]n determining which theory of recovery is available, the issue is whether this is a case of misdiagnosis subject only to negligence or if the facts also support an informed consent claim." Anaya Gomez, 180 Wn.2d at 617. The court explained that it was significant in Gates that the ophthalmologist had "two additional diagnostic tests for glaucoma which are simple, inexpensive, and risk free." Anaya Gomez, 180 Wn.2d at 621 (quoting Gates, 92 Wn.2d at 248). Consequently, the "choice the ophthalmologist could have put to Mrs. Gates was whether to do the additional testing in light of her borderline test result. Given the small cost and effort of those tests, the decision was relatively easy." Anaya Gomez, 180 Wn.2d at 621.

The court distinguished the situation before it from the situation in Gates, determining that "[t]his case is different from Gates because there was nothing else that Dr. Sauerwein could have done. Informing a patient about a likely erroneous lab result gives the health care provider nothing to "'put to the patient in the way of an intelligent and informed choice.'" Anaya Gomez, 180 Wn.2d at 622 (quoting Keogan v. Holy Family Hospital, 95 Wn.2d 306, 330, 622 P.2d 1246 (1980) (Hicks, J., concurring in part, dissenting in part)). Because Gates did not apply, the court applied the "Backlund rule" and affirmed the trial court's dismissal of the informed consent claim as a matter of law. Anaya Gomez, 180 Wn.2d at 623.

Important here, the court confirmed that Gates has not been overruled. Anaya Gomez, 180 Wn.2d at 623. The court explained:

10

> Backlund and Keogan state the general rule of when a plaintiff can make an informed consent claim. The Gates court allowed the informed consent claim based on a unique set of facts that are distinguishable from this case. Under Gates, there may be instances where the duty to inform arises during the diagnostic process, but this case does not present such facts. The determining factor is whether the process of diagnosis presents an informed decision for the patient to make about his or her care. Dr. Sauerwein's knowledge of the test result provided no treatment choice for Mrs. Anaya to make.

Anaya Gomez, 180 Wn.2d at 623.

Here, like Gates, and unlike Anaya Gomez, Davies presented evidence at summary judgment supporting that once she was correctly diagnosed with a cervical fracture, there were additional tests available as part of her initial diagnoses—namely a CT angiography (CTA) scan—to check for vertebral artery dissection prior to discharge. Davies's medical experts testified that vertebral artery injury is a "common" and "well known" occurrence following cervical spine fractures. As Davies's expert Dr. Harraher testified in deposition:

Q. Doctor, if I understand you correctly, the reason that there is a whole body of literature on the fact that you should screen for vertebral artery injury when you have a cervical spine fracture is because those are commonly found?

A. Yes.

Q. They are commonly found together and commonly missed; right?

A. Correct.

Davies's expert Dr. Becker similarly testified:

Q. What's the basis of the opinion that this fracture should have prompted imaging of her cervical arterial vessels?

A. It's well-known in the trauma literature that the mechanism of injury that leads to a cervical fracture is one that can also lead to a cervical arterial dissection, and there are criteria that have been

11

created that suggest that if someone has such a fracture that they should have cervical arterial imaging.

Davies further presented evidence at summary judgment that had she undergone a CTA, her vertebral artery dissection would have been diagnosed and a different treatment regimen other than sending her home in a neck brace would have been initiated, preventing her subsequent stroke. Dr. Becker explained:

Q. And then what do you believe that the treatment of either aspirin, Plavix, or heparin would have prevented, if anything?

A. I believe that it would have prevented her subsequent stroke.

Q. And what's the basis of the opinion that aspirin, Plavix, or heparin would have prevented her stroke?

A. If you look at all the studies that have been done of antithrombotic therapy in arterial dissections, they are all highly effective with very few patients ever going on to have a recurrent event, or an event if it was a dissection that was picked up kind of prophylactically.

Davies's medical expert, Dr. Tibbles, agreed:

Q. Okay, as far as causation opinions go in this case, you offered causation testimony that had Doctor Hirsig and Doctor Morris somehow through that process admitted her to trauma service, then she would not have suffered a stroke? Did I understand your causation opinion?

A. I believe more likely than not if she had received proper comprehensive care from a trauma team, including a neurosurgeon and the proper evaluation of her condition, that more likely than not they would have done the right thing and worked up the cervical spine fracture in the proper way, which would have included evaluation of the vessels.

Had the vessels been evaluated, the dissection seen, the potential—there's a window there to treat the stroke—treat the potential complications of stroke and therefore prevent the stroke.

Viewed in the light most favorable to Davies, as we must, her experts agree that had she undergone a CTA, she would have been diagnosed with a vertebral artery

12

dissection, which then would have been treated, preventing her from having a stroke the next day. Davies was never advised of the risk of a vertebral artery dissection or the availability of a CTA scan to look for the injury which would have led to a different treatment. Like Gates, and unlike Anaya Gomez, there were diagnostic and treating procedures available to the treating doctors. As the Supreme Court recognized in Anaya Gomez, "the determining factor is whether the process of diagnosis presents an informed decision for the patient to make about his or her care." 180 Wn.2d at 623. Here, there was. Summary judgment dismissal of Davies's informed consent claim was erroneous.

> B. Jury Instruction

Davies argues next that the trial court erred by giving an exercise of judgment instruction to the jury because the instruction is appropriate only where there is evidence that the physician makes a choice between alternative diagnoses. Davies contends that the trial record is devoid of evidence to support the jury's determination that Dr. Hirsig and MultiCare made such a choice. We disagree.

We review a decision on whether to give an exercise of judgment instruction for abuse of discretion. Fergen v. Sestero, 174 Wn. App. 393, 396, 298 P.2d 782 (2013), aff'd, 182 Wn.2d 794, 803, 346 P.3d 708 (2015). This is a fact specific inquiry. Fergen, 182 Wn.2d at 803. Jury instructions are generally sufficient if they: (1) are supported by the evidence; (2) allow each party to argue its theory of the case; and (3) properly inform the trier of fact of the applicable law when all the instructions are read together. Fergen, 182 Wn.2d at 803.

Our Supreme Court considered use of the exercise of judgment instruction most recently in Fergen. Fergen involved a consolidated appeal from two medical malpractice trials in which the trial court gave an exercise of judgment instruction and the jury returned a verdict for the defendants. In the first case, Fergen, Paul Fergen presented to the physician with a lump on his ankle. After performing a physical examination and taking an x-ray of the ankle, the physician diagnosed the lump as a benign cyst and referred him to an orthopedic office without conducting further testing. Fergen, 182 Wn.2d at 799. In doing so, the physician chose to forgo an ultrasound on Fergen's ankle, which may have found the rare form of cancer that began in Fergen's ankle and resulted in his death. Fergen, 182 Wn.2d at 799-800.

In the second case, Appukuttan v. Overlake Medical Center, Anil Appukuttan injured his leg during a soccer game. He visited the emergency room five times due to increasing pain in his leg. Multiple physicians examined him, but none measured the pressure in his leg to rule out compartment syndrome, instead believing his symptoms indicated a different diagnosis. Fergen, 182 Wn.2d at 801. Appukuttan "suffered permanent foot drop injury as a result of the failure to diagnose and treat his compartment syndrome." Fergen, 182 Wn.2d at 801.

In a split 5-4 decision, the majority first concluded that the instruction was supported under Washington law. The court also rejected an invitation to overrule precedent and abandon use of the instruction as unnecessary. Fergen, 182 Wn.2d at 803-05, 809-11. [4] Turning to the merits, the court held that for Fergen, the physician

---

[4] The dissent concluded that the exercise of judgment law was rooted in the discredited "error of judgment" instruction and not supported by Washington law; that the instruction is confusing, unfair, and inconsistent with the modern practice of giving neutral instructions; and that the instruction should be

"had a choice between referring Fergen to a specialist or not . . . ordering an X ray or not[, and] ordering follow up testing or not."  Fergen, 182 Wn.2d at 808.  For Appukuttan, the court concluded that the physicians decided that the pressure test "was unnecessary because their physical examination did not indicate that compartment syndrome was the diagnosis."  Fergen, 182 Wn.2d at 809.

In reaching its holding, the Supreme Court explained:

> In Washington, an exercise of judgment instruction is justified when (1) there is evidence that the physician exercised reasonable care and skill consistent with the applicable standard of care in formulating his or her judgment and (2) there is evidence that the physician made a choice among multiple alternative diagnoses (or courses of treatment).

Fergen, 182 Wn.2d at 806.  As this court recently summarized:

> Specifically, a court should give the instruction only when the physician presents sufficient evidence that they made a choice between two or more alternative, "reasonable [and] medically acceptable" treatment plans or diagnoses.  The court should not give the instruction "simply if a physician is practicing medicine at the time." The Fergen Court also recognized an exception to the instruction's use: A court should not give the exercise of judgment instruction in cases focusing on the inadequate skills of the physician.

Needham v. Dreyer, 11 Wn. App. 2d 479, 488-89, 454 P.3d 136, review denied, 195 Wn.2d 1017, 461 P.3d 1201 (2020) (quoting Fergen, 182 Wn.2d at 708).

Applying the Fergen standard to the testimony at trial, we conclude that the exercise of judgment instruction in this case was proper.  Dr. Hirsig testified that he considered the possibility that Davies could have a vertebral artery dissection in making his differential diagnosis.  After consulting with Dr. Henneman, the neuroradiologist that reviewed Davies's CT scan, he learned that she had a C3 fracture of her cervical spine,

___

disapproved of.  Fergen, 182 Wn.2d at 812-26 (Stephens, J., dissenting).  While the dissent in Fergen is compelling, we are bound by the majority opinion.

but Dr. Henneman did not identify a fracture of the transverse foramen. Such a fracture would have heightened Dr. Hirsig's awareness that there could be an injury to the vertebral artery. Consequently, Dr. Hirsig chose not to request a CTA to test for vertebral artery dissection because he believed the likelihood she did not have one outweighed the likelihood she did not. He summarized:

> with my assessment of the patient, with her physical findings and with her exam and with all the information I had, and in speaking to the neuroradiologist as well as the neurosurgeon [Dr. Morris], the consensus—I felt like that [vertebral arterial dissection] was not something I needed to further assess.

Neurosurgeon Dr. Morris, also testified that in consulting with Dr. Hirsig, he reviewed Ms. Davies's CT images and specifically looked for a fracture of the transverse foramen in the C3 area because the risk of injury to the vertebral artery is higher with such a fracture. Dr. Morris observed no sign of a fracture to the transverse foramen. And finally defense experts testified that both physicians met the standard of care in deciding not to order a CTA scan. Consistent with the standard set out in Fergen, the testimony supported that Dr. Hirsig and Dr. Morris, considered the possibility of a diagnosis of vertebral arterial dissection and made a choice not to pursue further.

Davies argues that this court's recent opinion in Needham compels reversal. Needham is distinguishable. In Needham, the plaintiff visited his primary care doctor complaining of breathing problems and gastrointestinal issues. 11 Wn. App. 2d at 481. The physician treated him for his preexisting HIV and diarrhea, but did not address his breathing problems. Needham, 11 Wn. App. at 481. Several days later he was found unconscious in cold weather, resulting in frostbite that required amputation. Needham,

16

11 Wn. App. 2d at 481. The plaintiff sued his physician and the clinic alleging medical negligence as the cause of his injuries. Needham, 11 Wn. App. 2d at 481-82. Over his objection, the trial court gave an exercise of judgment instruction and the jury entered a verdict for the defense. Needham, 11 Wn. App. 2d at 486. This court, applying Fergen, held that the exercise of judgment instruction was improper because there was no evidence that the physician actually made a choice in diagnosing or treating his breathing problems. But here, unlike Needham, there was evidence that the physicians considered and actively chose among alternative diagnoses and treatment plans.

We conclude that based on the standard approved in Fergen and the testimony presented, the trial court did not abuse its discretion in giving the exercise of judgment instruction.

C. Expert Witness

Davies argues finally that the trial court abused its discretion by preventing Dr. Harraher, a neurosurgeon, from testifying regarding the standard of care for Dr. Hirsig, an emergency room physician. We agree, but conclude the error was harmless.

We review the decision to exclude an expert witness's testimony for abuse of discretion. Driggs v. Howlett, 193 Wn. App. 875, 896, 371 P.3d 61 (2016). Discretion is abused if it is exercised on untenable grounds or for untenable reasons. Morrin v. Burris, 160 Wn.2d 745, 753, 161 P.3d 956 (2007).

"[E]xpert testimony will generally be necessary to establish the standard of care and proximate cause required in medical malpractice cases." Berger v. Sonneland, 144 Wn.2d 91, 111, 26 P.3d 257 (2001). The plaintiff must show that the health care provider "failed to exercise that degree of care, skill, and learning expected of a

17

reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances."  RCW 7.70.040(1).

Only experts who practice in the same field or have expertise in the relevant specialty may establish the standard of care.  McKee v. Am. Home Prods., Corp., 113 Wn.2d 701, 706, 782 P.2d 1045 (1989).  "The scope of the expert's knowledge, not his or her professional title, should govern 'the threshold question of admissibility of expert medical testimony in a malpractice case.'"  Hill v. Sacred Heart Med. Ctr., 143 Wn. App. 438, 447, 177 P.3d 1152 (2008) (quoting Pon Kwock Eng v. Klein, 127 Wn. App. 171, 172, 110 P.3d 844 (2005)).  "A physician with a medical degree is qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist, so long as the physician has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue in the medical malpractice action."  Hill, 143 Wn. App. at 447 (quoting Morton v. McFall, 128 Wn. App. 245, 253, 115 P.3d 1023 (2005)).  When experts are from a different school of medicine, the testimony should be allowed "(1) where the methods of treatment in the defendant's school and the school of the witness are the same, (2) where the method of treatment in the defendant's school and the school of the witness should be the same, or (3) the testimony of a witness is based on knowledge of the defendant's own school."  Leaverton v. Cascade Surgical Partners, P.L.L.C., 160 Wn. App. 512, 519, 248 P.3d 136 (2011).

We conclude that Dr. Harraher had sufficient expertise in the procedures and medical problem at issue to testify regarding the standard of care in Davies's case.  Dr.

Harraher completed a cerebrovascular fellowship at Stanford, including work regarding the vertebral artery. She testified that she has substantial emergency room experience, including the care and treatment of patients with neck fractures and the decision to order a CTA scan. Similarly, in Eng, this court held that an infectious disease doctor was qualified to testify regarding a neurosurgeon's failure to diagnose meningitis, where the expert's knowledge of the medical problem was uncontested and the defendant's method and failure to properly diagnose was not particularized to his neurological specialty.

However, even if the trial court erred in excluding this testimony, reversal is not required because the error was harmless. The test for harmless error is whether there is a reasonable probability that the error materially affected the outcome of the trial. Frantom v. State, 12 Wn. App. 2d 953, 959, 460 P.3d 1100 (2020). "A factor to consider when determining harmless error is whether excluded evidence involved cumulative evidence." Driggs, 193 Wn. App. at 903.

As an offer of proof, counsel for Davies stated that Dr. Harraher would have testified that Dr. Hirsig should not have discharged Davies due to the mechanism of her injury and the other clinical problems that she was having. But Davies's emergency medicine expert, Dr. Tibbles, testified extensively as to her opinion that Davies was not safe to go home and should not have been discharged. Because the excluded testimony was cumulative, reversal is not required.

We reverse summary judgment dismissal of Davies's informed consent claim and remand for trial.  We otherwise affirm.

_____
Mann, C.J.

WE CONCUR:

_____      _____
Coburn, J.                                   Dwyer, J.